PERRIN v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. March 1, 1909.)

No. 1,541.

1. CONSPIRACY (§ 43*)—CONSPIRACY TO DEFRAUD THE UNITED STATES—SUFFI-CIENCY OF INDICTMENT.

An indictment under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), which charges that the defendants conspired together to defraud the United States of the title to and possession of large tracts of public lands described, and avers overt acts thereunder, is sufficient without averring the means employed, the gist of the offense being the unlawful combination.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 85; Dec. Dig. § 43.*]

2. CONSPIRACY (§ 43*) — CONSPIRACY TO DEFRAUD THE UNITED STATES—SUFFI-CIENCY OF INDICTMENT.

An indictment under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), charging a conspiracy to defraud the United States by fraudulently obtaining title to and possession of certain described lands, then public lands of the United States, is not insufficient because it further charges that the purpose of the conspiracy was to be accomplished through the state by securing the selection of the lands by the state in lieu of school lands included in a government forest reservation and their fraudulent transfer from the state to defendants, nor because the state was entitled to select such lands under the law.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 85; Dec. Dig. § 43.*]

3. CRIMINAL LAW (§ 409*) — EVIDENCE — WRITTEN ADMISSIONS BY ACCUSED — RIGHT TO ADMISSION OF ENTIRE STATEMENT.

On the trial of defendants charged with conspiracy to defraud the United States of certain lands, a special agent for the Land Department testified that he asked one of the defendants for a statement in respect to the transaction, and in reply received a letter from him stating, "I send herewith the statement of Mr. Williams, covering, as I believe, all the points you suggested," and inclosing an affidavit of said Williams to which were attached copies of contracts of different dates between the defendants relating to the acquisition of the lands in question. *Held*, that it was error to permit the prosecution to detach the copy of one of the contracts from the affidavit and to introduce the same, together with the letter in evidence, as a declaration or admission of defendant, and at the same time to exclude the affidavit and copies of the other contracts which formed an integral part of the statement.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 409.*]

4. CRIMINAL LAW (§ 396*) — EVIDENCE — EVIDENCE ADMISSIBLE BY REASON OF ADMISSION OF SIMILAR EVIDENCE OF ADVERSE PARTY.

Where a contract between codefendants charged with conspiracy to defraud the United States was introduced in evidence by the prosecution as tending to prove such conspiracy, it was error to exclude evidence offered by defendants to show that on learning that such contract might

be unlawful it was superseded by another claimed to be legal, especially where evidence was admitted of acts done by the defendants subsequent to the date of the alleged substituted agreement.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 861; Dec. Dig. § 396.*]

Gilbert, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Northern District of California.

Peter F. Dunne and Barclay Henley, for plaintiff in error.

Robt. T. Devlin, U. S. Atty., and A. P. Black, Asst. U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The plaintiff in error was indicted in the court below with John A. Benson for a conspiracy to defraud the United States of the title to and possession of large tracts of land containing twelve thousand (12,000) acres, situated in the county of Tehama, in the state of California. To this indictment the defendants interposed demurrers on the grounds, among other things, that the indictment did not state facts sufficient to constitute an offense against the laws of the United States, and on the ground that the court was without jurisdiction for the reason that the alleged offenses set out in the indictment were exclusively a matter of state cognizance. The demurrers were overruled, and the defendants pleaded not guilty; they were tried and convicted, and a judgment entered accordingly. For a review of this judgment the defendants have prosecuted separate writs of error.

The first question to be determined is the sufficiency of the indictment. The indictment contains two counts. The first count charges that John A. Benson and the plaintiff in error, on the 31st day of October, 1903, in the city and county of San Francisco, state of California, conspired together to defraud the United States of the title to and possession of large tracts of land of great value, containing twelve thousand (12,000) acres, situated in the county of Tehama, state of California, and located more particularly in townships twenty-four (24) and twenty-five (25) north, ranges eight (8) and nine (9) west, Mt. Diablo base and meridian, which were lands of the United States open to and to be opened to selection in lieu of lands included and to be included within the limits of forest reservations established and to be established under the laws of the United States in the state of California, by means of false, fraudulent, and fictitious applications and affidavits to purchase, and false, fraudulent, and fictitious entries of said lands, which said false, fraudulent, and fictitious applications, affidavits, and entries were to be filed in the California state land office, at Sacramento, Cal., and by reason of which said false, fraudulent, and fictitious applications and affidavits to purchase and entries the state of California was to demand of the United States the lands covered by and mentioned in the said applications and affidavits in lieu of other lands in the state of California which had been heretofore

included in forest reservations established in said state of California by the United States government.

The indictment further charges that John A. Benson had theretofore caused the lands included in the forest reservations in lieu of which the state of California was to demand the lands applied for by the defendants to be covered by false, fraudulent, and fictitious applications and affidavits to purchase from the said state of California, and by the pretended relinquishment of said lands, so included in the said forest reservations, by the said John A. Benson, the state of California was apparently entitled to select other lands in lieu thereof.

The indictment further charges that according to and by reason of said conspiracy, combination, confederation, and agreement, and to the effect and object of said conspiracy, the defendants, at the city and county of San Francisco, state and Northern district of California, on the 31st day of October, 1903, entered into an agreement in writing, in the words and figures and substance following, to wit:

"This agreement, made and entered into this thirty-first day of October, 1903, between Edward B. Perrin, of Williams, Arizona, the party of the first part, and John A. Benson, of the city and county of San Francisco, state of California, the party of the second part, witnesseth: That the said party of the first part employs the said party of the second part to secure for him, by means of state indemnity school land location or in other legal manner the following described land, to wit: As per plat attached hereto—containing twelve thousand (12,000) acres.

"That the said party of the second part agrees to file the applications of the nominees of the said party of the first part for said land in the state land office, and to have said land properly selected in the United States land office, and certified to the state by the Secretary of the Interior; and, thereafter, as soon as the same can lawfully be done, to have a patent for the said land issued to the said party or his assigns—provided that, meanwhile, the full payment for said land has been made by said party of the first part, in accordance with the terms of this agreement.

"In consideration hereof the said party agrees to pay the said second party the sum of four & 50/100 ($4.50) dollars per acre for said land, (including 50c an acre for location fee in installments as follows, to wit: Two and 50/100 ($2.50) dollars per acre cash, and two ($2.00) dollars per acre when the application for the above described land has been approved by the state Surveyor General, which in no case shall be less than three months. The party of the first part is to have the privilege of paying the second installment within ninety days from November 18, 1903, with forest reserve script at $4.50 per acre—and party of the second part is also to pay the state of California, the sum of one dollar and twenty-five cents per acre when the same becomes due.

"If the party of the first part shall fail to obtain a good and sufficient title to said land or any part thereof, under the location to be made as aforesaid, or in some other legal manner within three years from date hereof, then the said second party will refund to the said party of the first part, any money that he, the said party of the second part, may have received on account hereof, in proportion to the quantity for which title may fail. It is agreed that there shall be no further location charges other than the $6,000 already paid, on account of lands, whether located within forest reserve script or otherwise, to be selected by the party of the first part in townships 24 and 25 north, ranges 8 and 9 West, Mount Diablo meridian."

The indictment charges that by the word "nominees," used in the aforesaid agreement, was meant the names of the fictitious persons whose false, fraudulent, and fictitious applications for the said land in said agreement mentioned were to be filed in the state land office, at Sacramento, Cal., by the said John A. Benson, and the said agreement

was by the consent of both parties thereto changed on or about the 1st day of November, 1903, so that the said "nominees" were to appear as the nominees of the party of the second part.

It is further charged that for the purpose of carrying out the object of the conspiracy, combination, federation, and agreement the plaintiff in error on the 31st day of October, 1903, paid the said John A. Benson the sum of thirty thousand ($30,000) dollars, which was received by the said John A. Benson on account of the foregoing agreement.

The indictment further charges that the plaintiff in error on or about the 1st day of November, 1903, caused one Charles P. Snell to write his name to a large number of blank nonmineral affidavits aggregating one hundred (100), more or less, which said affidavits so signed in blank by the said Snell were taken possession of by the plaintiff in error, and were afterwards by him turned over to the said John A. Benson to be fraudulently filled in and used as true and genuine affidavits, and filed along with the false, fraudulent, and fictitious applications and affidavits and entries aforesaid; and the said John A. Benson caused the said affidavits so signed in blank by said Charles P. Snell to be filled in and filed as the true and genuine affidavits of the said Charles P. Snell in connection with the aforesaid false and fictitious applications and entries.

It is further charged that on November 4, 1903, the said John A. Benson, to effect the object of the said conspiracy, caused to be filed in the state land office, at Sacramento, Cal., application No. 13,562, in the name of R. M. White, 810 Mission street, San Francisco, for the purchase of certain lands in township 24 north, range 8 west, Mt. Diablo base and meridian, which application was false, feigned, fraudulent, and fictitious, and then and there known to the said defendants to be false, feigned, fraudulent, and fictitious, in this: That the alleged R. M. White had not in fact made any application to purchase, and did not in fact live at 810 Mission street, San Francisco, or at any other place, and did not in fact exist.

The indictment further charges that on November 4th, in the year 1903, the said John A. Benson, to effect the object of the conspiracy, caused to be filed in the state land office, at Sacramento, Cal., application No. 13,563, in the name of John S. Forsythe, 407 Castro street, San Francisco, for the purchase of certain lands in township 24 north, range 8 west, Mt. Diablo base and meridian, which said application was false, feigned, fraudulent, and fictitious, and then and there known to the said defendants to be false, feigned, fraudulent, and fictitious, in this: that the alleged John S. Forsythe had not in fact made any application to purchase, and that he did not in fact live at 407 Castor street, San Francisco, or at any other place, and did not in fact exist.

In the second count of the indictment the conspiracy and combination are alleged substantially as in the first count, but the charges in the second count are more in detail concerning the means adopted by the defendants for the purpose of selecting and fraudulently entitling defendants to a pretended right to select and have the state of California select, and thereafter obtain title to the 12,000 acres of land mentioned in the indictment as school indemnity lieu lands from the United

States, and convey the same to the said defendants in lieu of said lands covered by forest reservations.

It is first objected to this indictment that its allegations are not clear and concise, and as to the matters charged with respect to the object of the alleged conspiracy, namely, to fraudulently obtain title to certain lands belonging to the United States in lieu of other lands belonging to the state, the indictment goes no further than to charge that the state of California was to demand of the United States the lands to be applied for, leaving it to be inferred without any charge to that effect that, when the state received the lands from the United States in exchange for lands of the state included in Forest Reservations, it would issue certificates of purchase and final patents for the lands so received to the applicants, who would transfer or convey the title to the plaintiff in error.

The indictment is unquestionably open to criticism, but giving effect to all of its allegations, including the agreement between Benson and the plaintiff in error set forth in the indictment, and construing these allegations in view of the statutory provisions relating to the exchange of lands of the state within forest reservations of the United States for lands outside of these reservations, we think the crime of conspiracy is sufficiently charged; but the criticism is directed mainly to allegations of the first count relating to the means employed to carry the conspiracy into effect. Section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676), under which the indictment was found, provides:

"If two or more persons conspire * * * to defraud the United States in any manner * * * and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable."

The gist of the offense is the unlawful combination. Bannon and Mulkey v. United States, 156 U. S. 464, 468, 15 Sup. Ct. 467, 39 L. Ed. 494. The unlawful combination is sufficiently charged in the indictment in the allegation that the defendants conspired together "to defraud the United States of the title to and possession of large tracts of land" described in the indictment. · It is not necessary to aver the means employed to carry the unlawful combination into effect. United States v. Benson, 70 Fed. 591, 17 C. C. A. 293. Having averred the use of such means as would clearly apprise the defendant of the offense of which he is charged, we think the allegations are sufficient.

It is next contended that the indictment does not charge a conspiracy to defraud the United States of anything; that, so far as any charge is made, it is that an agreement was entered into between Benson and the plaintiff in error to secure certain lands in California by means of state school lieu locations, and that if such an agreement amounted to a conspiracy to fraudulently obtain title to such lands it was a fraud upon the state and not upon the United States. This is but a limited and partial view of the indictment. It charges more. It alleges, in substance, that, when this conspiracy was formed to obtain title to the lands described, the lands were lands of the United States, and the object of the conspiracy was to secure a transfer of the title of the United States to the lands through the state of California to the plaintiff in error. The machinery of the state land office was to be used

as an instrument to carry out the purpose of the conspiracy and secure the title to certain lands of the United States, and it is no answer to this view of the acts of the parties to contend that the state was entitled to the lands as selections in lieu of other lands lost to the state. As stated by the Supreme Court in Hyde v. Shine, 199 U. S. 62, 82, 25 Sup. Ct. 760, 764, 50 L. Ed. 90, "The law punishes the false practices by which the lands are obtained." In United States v. Keitel, 211 U. S. 370, 374, 29 Sup. Ct. 123, 130, 53 L. Ed. ——, the court, referring to an indictment charging the conspiracy to be effected by procuring various persons or agents to enter coal lands in their own name ostensibly for their own benefit, but in reality for the use and benefit of the accused and a named corporation, said:

"The unsoundness of the argument that as, when the prohibited entries were made, the price of the lands was paid to the United States, therefore the United States could not have been defrauded, is refuted by its mere statement. If it were true, then in every case, however flagrant, where the lands of the United States were procured in violation of express prohibitions of law, the element of fraud would cease to exist by the mere payment of the price; that is to say, the successful operation of the fraud would deprive the transaction of its fraudulent character. But the inherent weakness of the contention need not be further pointed out, because its ¬¬ant of merit is conclusively established by the ruling of Hyde v. Shine, where a like contention was decided to be without foundation."

It cannot be doubted that, had a disclosure been made to the officers of the Land Department of the United States of the facts alleged in the indictment, it would have effectively barred the obtaining by the alleged conspirators from the United States through the state of California the lands mentioned in the indictment.

What the court said in the Keitel Case concerning the scope of the statute under consideration is applicable here:

"Nor do we deem it necessary to do more than briefly refer to the elaborate statements at bar concerning constructive crimes, and the fear which also found expression in the opinion below, that, if the words 'to defraud' in any manner or for any purpose receive a broad significance, charges of crime may be hereafter predicated upon acts not prohibited and innocuous in and of themselves, and which, when they were committed, might have been deemed by no one to afford the basis of a criminal prosecution. It will be time enough to consider such forebodings when a case arises indicating that the dread is real and not imaginary. That they are mere phantoms when applied to the case here presented results from the obvious consideration that the conspiracy charged had for its purpose the doing of acts which were in clear violation of the direct prohibition of the coal land laws, a prohibition whose meaning and effect had been unmistakably announced and applied by a decision of this court rendered many years before the formation of the conspiracy here charged. The cogency of these considerations becomes more pointedly manifest when it is borne in mind that the purpose and necessary effect of the conspiracy complained of was to obtain the lands of the United States by the suppression of facts which, had they been disclosed, would have rendered the acquisition impossible."

We are of the opinion that the indictment sufficiently charges an offense against the United States.

During the progress of the trial a number of objections were interposed to the admission and rejection of testimony; the rulings of the court upon these objections are assigned as errors.

The first witness placed upon the stand for the United States was one George C. Hunt, who testified that he was a special agent of the General Land Office of the United States; that he knew the plaintiff in error, who is referred to in the proceedings as Dr. Perrin. The witness testified that he had a conversation with Dr. Perrin in September, 1905, in regard to the contract he had entered into with Benson in 1903. The witness said they met on the train; that the witness desired to get a statement from the doctor about the transaction. He did not get a written statement, but Dr. Perrin gave a verbal statement. The attorney for the United States (Mr. Black) then asked the witness the following question:

"Q. Did you afterwards receive a communication from Dr. Perrin inclosing a copy of the contract; that is, inclosing what purported to be a statement of his secretary, Mr. Williams, which included a copy of the contract? A. I think I did. Q. I show you a paper dated September 14, 1905, and ask you if that was received by you in due course of mail, and whether that is signed by the defendant, Dr. Perrin? A. I received it through the mail, and, from what I have seen of his signature, I think that is it. That is the letter that I got. Q. And inclosed with that letter were true copies of what purported to be a copy of the contract sent to you by Mr. Williams, his secretary? A. Attached to this affidavit of Mr. Williams are copies of the contract. That is a copy of the contract."

The attorney for the United States then offered in evidence the letter of Dr. Perrin dated September 14, 1905, and the copy of the contract inclosed in the letter.

Mr. Dunne, the attorney for Dr. Perrin, then asked the witness:

"Q. I find, Mr. Hunt, on looking at this copy of the contract, that there is attached thereto a paper headed 'Affidavit'? A. Yes, sir. Q. I want to know from you whether in the communication that you received, which you say was signed by Dr. Perrin, the affidavit and the copy of the contract were attached, and reached you with that letter of Dr. Perrin's? * * * A. Yes, sir. These papers came with it. * * * The Court: Let them be read into the record. Mr. Dunne: You are going to read all those papers into the record? The Court: Only those that he offers in evidence. Mr. Black: I am going to read the letter and the contract 'A.' The papers will be here if you want to use them."

The letter was then read as follows:

"Williams, Arizona, September 14, 1905.
"Mr. George C. Hunt, Roswell, New Mexico.
"Dear Sir: I send herewith the statement of Mr. Williams, covering as I believe all the points you suggested.
"If the statement does not cover any point, I would thank you to advise me.
"When I reached Williams my brother had returned home from Washington. He tells me that Mr. Richards and Mr. Hitchcock will not be in Washington until the first of October, so I will delay my going until then.
"Yours truly, E. B. Perrin.
"Dict. 1 Enc. W.
"Since writing above, I have thought best to also enclose a statement from my brother, which I enclose herewith. E. B. P."

Mr. Black then offered in evidence and read the contract between Edward B. Perrin and John A. Benson, substantially as set forth in the indictment.

On cross-examination Mr. Dunne said:

"In the first place, in connection with the cross-examination of this witness, I desire to offer in evidence the statement of Mr. Williams referred to in Dr. Perrin's letter to him inclosed therewith, and to which, and as a part thereof this so-called contract is annexed."

To this evidence the attorney for the United States objected on the ground that it was irrelevant, immaterial, and incompetent, and not cross-examination, and also that it might be considered a self-serving declaration, and made after a conversation with a government agent. To this objection he added that he understood that the writer of the statement was in the courtroom. "He is here," said Mr. Black. "If counsel desires his evidence upon the subject, he can put him upon the stand, and he will have the chance to cross-examine him." The court sustained the objection to the paper. Mr. Dunne moved the court to strike out the letter of Dr. Perrin, and the paper called "Copy" of the contract. This motion was denied.

Subsequently, Lawrence S. Williams was called as a witness for the defendant. He was asked by Mr. Dunne:

"Mr. Williams, do you recall a circumstance that a copy of a contract was put in evidence here at the beginning of this case by Mr. Devlin or Mr. Black? It was detached from a letter and a statement which had been sent by Dr. Perrin to Mr. Hunt? A. Yes, sir. Q. Mr. Williams, did you ever send that copy of the contract? A. I did."

The attorney for the United States objected. The court sustained the objection, and the witness was not permitted to testify further concerning this statement.

The statement here referred to was identified, and is in the record. It is the affidavit made by L. S. Williams inclosed in the letter of Dr. Perrin's to George C. Hunt, special agent of the General Land Office, dated September 14, 1905. In this affidavit Williams swears that he was employed by Dr. Perrin in the capacity of secretary and bookkeeper since December, 1902. He relates the transactions leading up to the contract between Benson and Perrin, dated October 31, 1904, and designated as "Contract A." He says:

"When this contract was drawn, Dr. Perrin, Mr. Charles P. Snell, who was also in Dr. Perrin's employ as legal adviser and timber cruiser, and myself retired to one of Mr. Benson's private offices to read over and confer about the same. Dr. Perrin read the contract aloud, and when he came to the word 'nominees' he wanted to know what the word implied, and how in our estimation Benson would proceed to get title to the land. Mr. Snell thought that the contract was all right and perfectly legal, and that it was up to Benson to furnish the nominees, and that all he (Perrin) wanted was a legal title to the land. When we returned to the room in which Benson was seated, Dr. Perrin again referred to the word 'nominees,' and asked Benson at the same time how he intended to get title to the land. Benson laughingly replied: 'Never mind, Doctor, that is exactly what Hovey and others would like to know. Depend upon me; every step I take will be perfectly legal, and I will give you a perfect title.'"

Williams then states that on the 20th of November, 1903, another contract for 2,000 acres additional to be secured in the same manner as that in contract "A" was signed by Dr. Perrin. A copy of this contract was appended to the affidavit and marked "C." The affidavit

sets forth the payments made by Dr. Perrin to Benson in cash and forest reserve script for the lands referred to in these contracts, and the statement made by Dr. Perrin concerning the reason for turning over to Benson 8,000 acres of forest reserve scrip held by Dr. Perrin at that time, in exchange for state school indemnity locations which he was to receive from Benson. The affidavit then relates a statement made by Dr. Perrin in February, 1904, that he had conferred with Judge A. E. Bolton of San Francisco, and that the contracts with Benson were in all probability illegal ones; that he had gone to Benson, on threats that he would have Benson arrested, and had succeeded in getting another contract from him. A copy of a copy of this contract was attached to the affidavit, marked "C." This contract, dated February 4, 1904, contains an agreement on the part of Dr. Perrin to purchase lands from Benson to the amount of 14,000 acres; Benson to obtain a good title, under the provisions of the act of Congress of June 4, 1897—the forest reserve act. The agreement also provided that:

"For that purpose said Perrin has paid said Benson thirty-two thousand ($32,000) dollars, to cover payment for his services, the surveying fee for selecting the land, and the expenses and costs in paying for said lands in the procuring title therefor, during the time specified in this contract, under said law, or under any law by which title can now, or at any time during the life of this contract, be legally obtained."

Dr. Perrin was called as a witness in his own behalf, and was shown this contract, dated February 4, 1904, and was asked this question: "Was this paper, Dr. Perrin, intended by you as a substitute and supersession of the October and November agreements?" To which question the witness answered, "It was." Thereupon the United States by its attorney moved to strike out said answer, which motion the court granted. Thereafter, during the direct examination of Dr. Perrin, and after his identification of the signatures to this contract of February 4, 1904, bearing the signature of Dr. Perrin and also the signature of John A. Benson, the documents were offered in evidence. The attorney for the United States objected, and the court sustained the objection. To the rulings of the court in the progress of the trial excluding the affidavit of Williams and the contracts and the other documents inclosed in Dr. Perrin's letter of September 14, 1905, and denying defendant's motion to strike out Dr. Perrin's letter and the copy of the contract of October 31, 1903, the attorney for Dr. Perrin interposed exceptions and reserved exceptions to the rulings.

We are of the opinion that the court was in error in excluding the affidavit of Williams inclosed in the letter of Dr. Perrin to Hunt. The latter was a special agent of the General Land Office; he was a witness for the United States. He testified that he desired to get a statement from Dr. Perrin about the transaction with Benson, and obtained a verbal statement from Dr. Perrin, and in addition he received a letter from Dr. Perrin in which the latter said:

"I send herewith the statement of Mr. Williams covering as I believe all the points you suggested. If the statement does not cover any point, I would thank you to advise me."

The statement referred to in this letter consisted of the statement of Mr. Williams, who was employed as Dr. Perrin's secretary and book-keeper, and this statement had attached to it copies of the contracts between Benson and Dr. Perrin relating to the transaction which was the subject of the investigation by the special agent, namely, the contracts of October 31, 1903, November 20, 1903, and February 4, 1904. The attorney for the United States detached the contracts from the Williams statement and offered in evidence the letter of Dr. Perrin, with the copy of the contract of October 31, 1903, withholding from the jury the statement of Williams to which the copy of this contract was attached, and to which it related; and withholding also the copies of the two remaining contracts of November 20, 1903, and February 4, 1904; both of these contracts relating to the transactions between Benson and Dr. Perrin, originating in the contract of October 31, 1903.

The letter and contract of October 31, 1903, were offered in evidence as containing a declaration or admission of the defendant Perrin as to the transaction in question. In such a case the rule is stated by the Supreme Court of the United States in Insurance Company v. Newton, 89 U. S. 32, 35, 22 L. Ed. 793:

"Every admission is to be taken as an entirety of the fact which makes for the one side, with the qualifications which limit, modify, or destroy its effect on the other side. This is a settled principle which has passed by its universality into an axiom of the law."

This rule, together with its reason, is thus stated in Best's Law of Evidence, § 520:

"Where part of a document or statement is used as self-harming evidence against a party, he has a right to have the whole of it laid before the jury, who may then consider, and attach what weight they see fit to any self-serving statements it contains."

To the same effect is Taylor on Evidence, par. 725.

In the case of Lombard v. Chaplin, 98 Me. 309, 314, 56 Atl. 903, 905, it was said:

"It is claimed that the whole letter is inadmissible, even if a part of it had been put in evidence, as it was a self-serving, not self-disserving, statement made to a third party. If the writer of the letter was a witness only, it is true that the letter could be used only to contradict him and impeach his credibility, and not for the purpose of proving or disproving any fact material to the issue involved. But when the writer is also a party, this rule does not apply, for every statement in his letter, to whomsoever written, may be taken as an admission to prove or disprove any fact relevant to the issue.

· "In the former case, where the writer is a witness only, his letter would be admissible only to contradict his present testimony. But in the latter case, where the writer is also a party, his statement may be used to contradict his present testimony, or as an admission of fact if material to the issue. In the case at bar, the extracts from the defendant's letter could not have been used to contradict his present testimony, for no such contradiction appeared or was claimed; hence they must necessarily have been used as admissions of fact on the part of the defendant. Considering this letter, then, as an admission previously made by the defendant, did counsel for the plaintiff, by introducing a part of it, thereby give the defendant the right to introduce the balance? We think he did. This court in Storer v. Gowen, 18 Me. 176, have held that: 'It is a principle well settled that the admissions of a party, when given in evidence, must be taken together, as well what makes in his favor as against him. Both are equal evidence to the jury, who will give every part of the testimony such credence as it may appear to deserve.' Ham-

matt v. Emerson, 27 Me. 308, 336, 46 Am. Dec. 598. In an early decision in Massachusetts, Whitwell v. Wyer, 11 Mass. 91, this is the language of the court: 'Where you rely upon a confession you must take it altogether.' And the same court says in O'Brien v. Cheney, 5 Cush. 148: 'The general principle for which the defendant contends, namely, that, when the admission of a part is offered in evidence, he is entitled to have the whole of what he said on the subject, at that interview, stated as a part of the evidence, is correct and is not denied.' See, also, Adam v. Eames, 107 Mass. 276; Dole v. Wooldredge, 142 Mass. 161, 7 N. E. 832.

"In regard to the admission of the defendant, the court says in Mattocks v. Lyman, 18 Vt. 102, 46 Am. Dec. 138: 'That the whole declaration of the party made at one time, as well that in his favor as that which is against him, must be received and weighed.' And in Moore v. Wright, 90 Ill. 473, the court holds that: 'Where a party's admissions are called for, the party calling for the same is bound to take all the other party said upon the occasion concerning the matter in dispute, whether it makes for or against him.' It is unnecessary to make further citations. The above, we think, is a fair statement of the practice both in this country and England with respect to the admissibility of admission as testimony."

It follows from this rule that with the letter of Dr. Perrin the whole of the statement should have been admitted in evidence, including the copies of the agreements attached to the statement; or if excluded because the author of the statement was present in court at the trial and could be called by the defendants as a witness and cross-examined by the prosecution, then when called he should have been permitted to testify concerning the matters set forth in such statement; or if the statement of Williams and his testimony relating thereto were properly excluded by the court, then surely Dr. Perrin should have been permitted to testify concerning his letter to Hunt inclosing the Williams' statement and the copies of the agreements.

Dr. Perrin was called as a witness in his own behalf and was asked: "Was this paper"—referring to the agreement of February 4, 1904— "intended by you as a substitute and supersession of the October and November agreements?" He answered that, "It was." But this answer was stricken out by the court on motion of the attorney for the United States. Dr. Perrin certainly could not be deprived of the right to testify concerning the agreement of October 31, 1903. That agreement was in evidence against him, and he had a right to make any explanation of it he saw fit. He had a right to say whether it had continued in effect, or whether it had been substituted or superseded by another agreement. It was contended on the part of the defendants that the agreement of February 4, 1904, was perfectly innocent, and was substituted for the former agreements when it was found that they might be construed as illegal. What weight the jury would give to such testimony or such contention was another question, and in no way affected his right to have the evidence laid before the jury. "A court or jury are not bound to give equal credit to all parts of a statement or admission; they may believe a part and disregard the rest. The rule only requires that what is in favor of the party making the admissions should be fairly and liberally considered and weighed with the other evidence." Jones on the Law of Evidence, § 295.

Evidence on behalf of the United States was introduced tending to show that in pursuance of the agreement of October 31, 1903, Benson had filed or procured to be filed in the office of the Surveyor General

of the state a number of applications for the purchase from the state of certain lands of the United States, to be taken by the state in lieu of lands included in certain forest reserves of the United States. These applications numbered 29, and were introduced in evidence over the objections of the defendants and marked Exhibits 4, and 6 to 33, inclusive. Twenty of these applications were dated from October 10, 1903, to November 18, 1903, and called originally for 12,159.60 acres, including the two applications mentioned in the indictment; and nine applications were dated from February 13, 1904, to April 14, 1906, and called originally for 5,694.46 acres. These nine applications, exhibits numbered 8, 22, 23, 24, 28, 29, 30, 32, and 33, were all made subsequent to the contract of February 4, 1904, and the question arises: Did not the admission of these nine applications dated subsequently to February 4, 1904, as evidence against the plaintiff in error, open the door for the admission of the agreement of February 4, 1904? We are of the opinion that it did. We think it was for the jury under proper instructions to determine what weight should be given to that agreement in connection with the two previous agreements and the applications for land made subsequent to that date.

There are a number of other errors assigned which we do not think it necessary to review. We have carefully considered the rulings of the court in each case, and we are of the opinion that there was no prejudicial error in any of them.

For the errors we have pointed out, the judgment will be reversed, with direction to grant a new trial.

GILBERT, Circuit Judge (dissenting). I submit that the doctrine that every admission is to be taken as an entirety, and that, where a part of a document or statement is used as self-harming evidence against a party, he has the right to have the whole of it laid before the jury, has no application whatever to the ruling of the trial court in excluding from the evidence the contract of February 4, 1904, and the affidavit of Williams made on September 15, 1905. The indictment charged that the plaintiff in error and another did on October 31, 1903, enter into a conspiracy to defraud the United States of large tracts of land, under the agreement made on that day, which was set forth in hæc verba, and it alleged that on November 4, 1903, as overt acts done to carry out the conspiracy, the alleged conspirators filed two false, fraudulent, and fictitious applications for the purchase of certain designated parcels of land. To prove one of the facts so alleged in the indictment, the government offered in evidence a copy of the agreement of October 31, 1903. The copy so offered had come lawfully into the possession of the District Attorney. It was the best evidence of the allegation so made in the indictment. It was an instrument which was complete in itself, and it referred to no other instrument. But it is said that it had become so indissolubly connected with two other papers that it could not be severed from them for evidential purposes against the plaintiff in error. What is the tie that it is said so to bind these three papers together? It is that the plaintiff in error had voluntarily surrendered to an officer of the government his contract of October 31, 1903, together with his contract of February 4, 1904, and the affidavit

of his secretary of date September 15, 1905; and the theory seems to be that, because the papers were surrendered at the same time, the introduction of one of them by the prosecution entitled the plaintiff in error to the introduction of the other two, no matter at what time they were made or signed, for the reason that they were all parts of a single admission. What is the admission of the plaintiff in error that was proven in this case? It is not his letter of September 15, 1905, for that letter contains no admission. If any admission of his was received in evidence, it was that he entered into the contract of October 31, 1903. Had he declined to deliver up that contract, it may be doubted whether the prosecution could have proved the terms thereof, for he could have refused to furnish it as evidence against himself. But he voluntarily surrendered it, and the argument is that because he surrendered with it two other papers of a later date he was entitled to have the latter go in evidence with the first. But it is no part of the admission that he made the contract of October 31, 1903, that he afterwards made a different contract to supersede it, nor is the affidavit of his secretary any part of that admission—an affidavit made two years after the date of the first contract for the purpose of explaining it and the method in which operations had been conducted thereunder.

The substantive facts to be proved by the government were that the plaintiff in error and Benson entered into the agreement which is set forth in the indictment, and that thereunder they made fraudulent applications to obtain lands. How could it affect the proof of that agreement, and of the 20 applications shown to have been made under it, to prove the terms of a later agreement which was intended to supersede the first? In Wigmore on Evidence, § 2113, it is said:

"The opponent against whom an utterance has been put in may in his turn complement it by putting in the remainder in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance."

Here we may pause to inquire, would the affidavit of Williams and the contract of February 4, 1904, aid the court or the jury in arriving at a complete understanding of the total tenor and effect of the contract of October 31, 1903, and are those instruments useful in completing the sense of that contract? Says the same author, in section 2119:

"It follows from the general principle that a distinct or separate utterance is not receivable under this principle. The boundary line here is usually defined by saying that all that was uttered at the same time on the same subject is receivable."

How is it possible by any rule of construction or process of reasoning to reach the conclusion that these three papers, dissociated in time and subject, become utterances made at the same time and upon the same subject from the mere fact that they were surrendered by the plaintiff in error at the same time and in a single envelope, or were all referred to in a single letter? It is to be observed, also, that the defense introduced the original contract in evidence, and thereby cured the error, if error there was, in the introduction of the copy which was introduced by the prosecution.

But it is suggested that, irrespective of the question of its admissibility on the grounds above discussed, the contract of February 4, 1904, was admissible in evidence to show under what agreement the parties charged in the indictment made their applications for lands after the date of that instrument. This suggestion at first glance seems plausible, but on consideration it will be seen that it is without merit, and that there was, upon that ground, no reversible error in the ruling of the trial court which excluded such evidence. Under the agreement set forth in the indictment, the government proved, and it was not disputed, that 20 applications were made on or before November 18, 1903, including the two applications referred to in the indictment. The proof of the applications made after February 4, 1904, may be regarded as superfluous. It was offered, doubtless, for the reason that the 9 applications so made subsequent to February 4, 1904, were second applications for some of the lands which had already been covered by the first 20 applications, and were made for the acquisition of lands which were all within the scheme of the original contract, as shown by the map which was made part thereof. It is important to bear in mind that the offense charged was an unlawful conspiracy, not the act of unlawfully acquiring government land. To sustain the indictment it would have been sufficient, after proving the unlawful agreement, to prove one overt act done to carry out the conspiracy. It was unnecessary to adduce evidence of applications made after February 1, 1904. It would not have tended in the slightest degree to show innocence of the charge made in the indictment, if the defense had been permitted to prove that the applications made after February 4, 1904, were made under a legal contract. The proof of the applications made after the second agreement was entered into could not prejudice the plaintiff in error, nor could any explanation which he might have offered of those applications, or any proof under which they were made, affect the charge made in the indictment, and the evidence which was legitimately admitted to sustain it, for the court expressly charged the jury in that connection as follows:

"There has been introduced in evidence certain applications to purchase lands from the state of California, but I instruct you that unless the government has shown to your satisfaction and beyond a reasonable doubt that said particular applications, or some of them, were filed as a part of the contract set forth in the indictment, or in pursuance thereof, then you should disregard them entirely."

Can it be said that the second contract was admissible to prove the intent of the parties in making the first contract? If such is the law, it follows that it is in the power of all who conspire to acquire lands of the United States unlawfully to purge their conspiracy of its illegality by making a new and innocent agreement at any time before indictment, or indeed after indictment, provided it is shown that some of their applications for lands were made under the new agreement.