### JELKE v. UNITED STATES and eight other cases.

(Circuit Court of Appeals, Seventh Circuit. March 2, 1918. Rehearing Denied December 10, 1918.)

Nos. 2168, 2170–2176, 2220.

1. CONSPIRACY ⟺43(10)—INDICTMENT—SUFFICIENCY.
　　An indictment for conspiracy to defraud the United States of the special tax of 10 cents per pound, imposed on manufacturers of colored oleomargarine, considered, and *held* sufficient.

2. INDICTMENT AND INFORMATION ⟺55—RULES OF CONSTRUCTION.
　　By modern decisions the rules governing criminal pleadings have become less technical and more practical, but no less protective to the accused.

3. INDICTMENT AND INFORMATION ⟺110(4)—SUFFICIENCY—CHARGING OFFENSE IN LANGUAGE OF STATUTE.
　　An indictment is sufficient which charges a statutory crime substantially in the words of the statute, except in cases where other prece-

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

JELKE V. UNITED STATES **265**

dents have been firmly established in analogous offenses at common law, or where such a charge would not fairly inform the accused of the nature of the charge against him.

4. INDICTMENT AND INFORMATION ☜110(10)—STATUTORY LANGUAGE—CONSPIRACY.

An indictment for conspiracy under Criminal Code, § 37 (Comp. St. § 10201), is sufficient if it follows the language of the statute and contains a sufficient statement of an overt act, except when the object of the conspiracy is in itself lawful, where the means must be set forth with such particularity as to disclose their illegality and the criminal intent, and except also where the conspiracy is to defraud the government in such manner that a detailed statement of the means and time and place is necessary to fairly inform defendant of the character of the offense.

5. CONSPIRACY ☜43(6)—INDICTMENT—SUFFICIENCY.

A crime which is the object of a conspiracy need not be described with the same particularity in an indictment for the conspiracy as in an indictment for such crime itself.

6. INDICTMENT AND INFORMATION ☜111(1)—INDICTMENT—NEGATIVING EXCEPTIONS IN STATUTE.

An indictment for conspiracy to violate a statute need not negative an exception created by a proviso in the statute.

7. CONSPIRACY ☜47—CRIMINAL PROSECUTION—EVIDENCE.

In conspiracy cases the proof must, from the nature of the charge, consist largely of circumstantial evidence, and the conspiracy may be established by inferences to be fairly drawn from the facts proved.

8. CRIMINAL LAW ☜829(1)—TRIAL—INSTRUCTIONS.

The refusal of requested instructions, although stating correct propositions, is not reversible error, where the charge given fairly and correctly presents the issues.

9. CRIMINAL LAW ☜822(12)—INSTRUCTIONS AS A WHOLE.

Instructions relating to testimony of accomplices, viewed in the light of the entire charge, *held* to contain no reversible error.

10. CRIMINAL LAW ☜371(1, 12)—OTHER ACTS—MOTIVE—INTENT.

In a prosecution for conspiracy to violate a statute, it was within the discretion of the court to admit evidence of acts by defendants prior to the taking effect of the particular statute to show motive and intent, where they were closely connected with and were similar to subsequent acts, and where a similar statute was then in force.

11. CRIMINAL LAW ☜371(1)—OTHER ACTS—EVIDENCE OF INTENT.

In a prosecution for conspiracy to defraud the government of taxes on oleomargarine, a state statute prohibiting the sale of colored oleomargarine *held* admissible as throwing light on defendants' intent, in connection with evidence that defendants sold to certain retailers inconsiderable quantities of colored oleomargarine, and further evidence tending to show that they subsequently sold to the same purchasers large quantities of uncolored, which the purchasers colored and used to refill the original higher tax stamped packages.

12. WITNESSES ☜267—CROSS-EXAMINATION—DISCRETION.

The extent to which cross-examination of witnesses should be allowed in a criminal case is largely within the discretion of the trial judge.

13. WITNESSES ☜260, 263—EXAMINATION—CALLING ATTENTION TO FORMER TESTIMONY.

When the court, in the trial of a criminal case, is convinced that a witness is "conveniently forgetful" of matters to which he testified before the grand jury, the trial judge is justified on his own motion in having the previous testimony read to the witness, not in the presence of the jury, and again placing him on the stand.

Mack, Circuit Judge, dissenting.

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Criminal prosecution by the United States against John F. Jelke, Harry E. Hitchins, William M. Steele, Hugh D. Cameron, William L. Lillard, William P. Jackson, Fred Rapp, L. B. Tullis, Francis M. Lowry, and four others. From judgments of conviction, the defendants named separately bring error. Affirmed.

The nine plaintiffs in error and four others were indicted by the grand jury, charged with the crime of conspiracy to defraud the United States out of the ten cents per pound tax due by law upon certain colored oleomargarine, using means set forth in the indictment and hereinafter more particularly described.

Of the thirteen defendants jointly charged with the offense, one, Philemon Berry, was never apprehended; the defendant Harvey P. McFarland was acquitted by the jury, and the two defendants Abner D. Mize and O. S. Martin were dismissed upon order of the court. The remaining defendants were found guilty by the jury, and each was sentenced to pay a heavy fine. The defendants Francis M. Lowry and John F. Jelke were also sentenced to the penitentiary for the terms of one and two years respectively.

Each plaintiff in error separately obtained a writ of error to review this judgment.

The indictment is as follows (the paragraphing is arbitrary, and for convenience sake follows the copy as it appears in the brief of plaintiffs in error):

## "The Indictment.

Section.

In the District Court of the United States of America for the Northern District of Illinois, Eastern Division.

Northern District of Illinois, Eastern Division—Sct.

The grand jurors for the United States of America impaneled and sworn in the District Court of the United States for the Northern District of Illinois, and inquiring in and for the Eastern Division of said Northern District, upon their oath present that,

upon the first day of January, in the year nineteen hundred and three, and continuously from that day to the date of the return of this indictment into open court, and therefore continuously from the first day of August, in the year nineteen hundred and eight, to the first day of July, in the year nineteen hundred and eleven,

one John F. Jelke, one Francis M. Lowry, one Abner D. Mize, one Philemon Berry, one Harry E. Hitchins, one William M. Steele, one Harvey P. McFarland, one Hugh D. Cameron, one William L. Lillard, one William P. Jackson, one Fred Rapp, one L. B. Tullis (whose Christian name is to the said grand jurors unknown), and one O. S. Martin (whose Christian name is to the said grand jurors unknown), each late of the city of Chicago,

in said Eastern Division of the Northern District of Illinois, hereinafter in this indictment referred to as the defendants, at the city of Chicago, in the said division and district,

unlawfully, willfully, knowingly, and feloniously have combined, conspired, confederated and agreed together to defraud the said United States of the tax by law provided to become due to the said United States of ten cents per pound upon certain oleomargarine, artificially colored to look like butter of a shade of yellow,

which the defendants, throughout said period of time, agreed they should cause to be manufactured, produced and sold, and removed for consumption and use from the place of manufacture,

which oleomargarine the defendants agreed and intended they would cause to be manufactured by the addition to and the mixing with oleomargarine which was subject by law to a tax of one-fourth of one cent per pound, (commonly called white oleomargarine or white goods), of artificial coloration which would cause it to look like butter of a shade of yellow,

Section.

8 and, as a part of said conspiracy, the said defendants agreed that they would cause divers individuals, to wit, William A. Dwan, Benjamin Balch, Henry F. Marhoefer, Charles R. Kenyon, Charles R. Zurn, Anton T. Peterson, Frank S. Goll, William A. Schaefer, Edward Marhoefer, Harry H. Kendall, Sherwood W. Alger, Eugene Salvo, Fred Marhoefer, and J. G. Paule (whose Christian name is to the said grand jurors unknown), and other persons too numerous to be here named,

9 at divers times and on divers days throughout said period of time,

10 to add to and mix with the said white oleomargarine artificial coloration to cause it to look like butter of a shade of yellow,

11 which white oleomargarine and which artificial coloring matter to cause it to look like butter of a shade of yellow,

12 the said defendants agreed among themselves to furnish and cause to be furnished

13 to the said William A. Dwan, Benjamin Balch, Henry F. Marhoefer, Charles R. Kenyon, Charles R. Zurn, Anton T. Peterson, Frank S. Goll, William A. Schaefer, Edward Marhoefer, Harry H. Kendall, Sherwood W. Alger, Eugene Salvo, Fred Marhoefer, and J. G. Paule (whose Christian name is to the said grand jurors unknown), and other persons too numerous to be here named,

14 and further as a part of said conspiracy, the defendants agreed among themselves

15 (a) to furnish to the said individuals last above named and referred to, tub liners to be used by the said individuals last above named and referred to in packing in tubs the said oleomargarine after the addition of artificial coloration causing it to look like butter of a shade of yellow as aforesaid, and wrappers of paper to be used by the said individuals last named and referred to in packing in pound packages and packages of other weight the said oleomargarine after it had been artificially colored, as aforesaid,

16 and further as a part of said conspiracy,

17 (b) to cause the said individuals last named and referred to to sell and furnish for profit to consumers and persons other than their own families and remove for consumption and use from the place where such coloring matter was added to and mixed with said oleomargarine, the said oleomargarine thus artificially colored,

18 without paying and causing to be paid,

19 and intending that they, the defendants, and the said individuals, last hereinabove named and referred to, should not pay to the United States, and intending that no payment whatever should be made by any person, firm or corporation to the said United States of, the tax, which would then, to wit, at the time of such removal for sale and for consumption and use, as aforesaid, become due to the said United States, to wit, the tax of ten cents per pound, as provided by law,

20 and intending that the said United States should be defrauded out of the money by law due the said United States for such tax.

21 And the grand jurors aforesaid, upon their oath aforesaid, do further present, that in pursuance of the said conspiracy and in order to effect the object of the same, the said defendants* on, to wit, the eleventh day of October, in the year nineteen hundred and nine, at the city of Chicago, in the division and district aforesaid, knowingly, willfully and feloniously delivered and caused to be delivered to the said William A. Dwan, a large quantity, to wit, nine hundred and sixty pounds, of white oleomargarine and sufficient coloring matter to color the same to look like butter of a shade of yellow.

22 (Same as section 21 down to star), on, to wit, the eleventh day of October, in the year nineteen hundred and nine, at the city of Chicago, in the division and district aforesaid, knowingly, willfully, and feloniously delivered and caused to be delivered to the said Benjamin Balch, a large quantity, to wit, eighty pounds of white oleomargarine and sufficient coloring matter to color the same to look like butter of a shade of yellow."

Paragraphs 23 to 38, inclusive, allege defendants at different times and at different places delivered large quantities of white oleomargarine with free coloring material to divers persons named therein.

Section.
39    "(Same as in section 37 down to the star) the said Harvey P. McFarland (defendant herein) on, to wit, the twenty-sixth day of August, in the year nineteen hundred and nine, at the city of Chicago, in the division and district aforesaid, knowingly, willfully and feloniously did prepare and cause to be prepared a certain writing and ticket called a sales ticket, which was of the tenor following, to wit:

John F. Jelke Co. City Sales 40 Date, 8/26/09. No. 4844.
          Chicago.
Sold to New City Creamery
          4803 Ashland Ave.  Ch'k'd by A. W.

| ......................................Fig. by..................... | 905 | 0 |
| Via .................................................Salesman F.................... | 109 | 35 |

Original 3213.

| Packages Oleo. | Packages Misc. | Packages Weight | Pounds Misc. | Pounds Oleo. | Price | |
|---|---|---|---|---|---|---|
| 1 tub | 1st Prize | | | 60# | 24¾ · | 14.85 |
| 10 tubs | Fancy | 60" ea | | 600 | 15 | 90.00 |
| 1 crate 5# Fibre boxes | | | | | | 4.00 |
| 200 | 60 paper circles | | | | 2.50 | .50 |
| | | | | | M | 109.35 |

Paragraphs 40 and 41 are similar in purport to paragraph 39 and charge McFarland with having prepared a sales ticket to the New City Creamery on a date different than that set forth in paragraph 39.

42    "And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said John F. Jelke, Francis M. Lowry, Abner D. Mize, Philemon Berry, Harry E. Hitchins, William M. Steele, Harvey P. McFarland, Hugh D. Cameron, William L. Lillard, William P. Jackson, Fred Rapp, L. B. Tullis, and O. S. Martin, in the manner and form aforesaid throughout the period of time from the first day of January in the year nineteen hundred and three to the first day of July, in the year nineteen hundred and eleven, continuously have conspired, combined, confederated and agreed together to defraud the said United States in the manner as aforesaid; against the peace and dignity of the said United States and contrary to the form of the statute of the same in such case made and provided."

Assignments of error numbering 127 for a single plaintiff in error, covering some 79 pages of the record, will be divided into five heads and set forth in the fore part of the statement of facts, in order that it may be better understood.

Plaintiffs in error complain of the ruling of the court: (a) In holding the indictment sufficient.  (b) In denying motion of plaintiffs in error to dismiss each defendant upon the ground that the evidence was not sufficient to justify a conviction.  (c) In admitting evidence against the objection of the plaintiffs in error, and in rejecting evidence offered by plaintiffs in error.  (d) In giving instructions to the jury to which exceptions were taken, and in refusing instructions proposed by plaintiffs in error.  (e) In making adverse rulings during the trial upon various unusual questions and not covered by any one of the other assignments.

It is impossible to accurately and briefly picture the record because of its length.  The trial lasted weeks, and testimony covering thousands of pages was taken.  A more detailed statement of the facts necessary to the consideration of each question raised will appear in the opinion, while a brief general statement only is here attempted.

The Oleomargarine Act (Act Aug. 2, 1886, c. 840, 24 Stat. 209) as amended (Act May 9, 1902, c. 784, 32 Stat. 193), went into effect July 1, 1902, and its constitutionality was sustained in the case of McCray v. United States, 195 U. S. 27, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561. Generally speaking, this act as amended imposed a tax of ten cents per pound upon oleomargarine artificially colored to look like butter, and one-fourth cent per pound upon white oleomargarine. Prior to the passage of this act a flat tax of two cents a pound was imposed on all oleomargarine, colored or uncolored.

The more important sections, so far as this case is concerned, are here quoted:

"Section 2. That for the purposes of this act certain manufactured substances, certain extracts, and certain mixtures and compounds, including such mixtures and compounds with butter, shall be known and designated as 'oleomargarine,' namely: All substances heretofore known as oleomargarine, oleo, oleomargarine oil, butterine, lardine, suine, and neutral; all mixtures and compounds of oleomargarine, oleo, oleomargarine oil, butterine, lardine, suine, and neutral; all lard extracts and tallow extracts; and all mixtures and compounds of tallow, beef fat, suet, lard, lard-oil, vegetable oil, annatto, and other coloring matter, intestinal fat, and offal fat made in imitation or semblance of butter, or when so made, calculated or intended to be sold as butter or for butter." Comp. St. § 6216.

"Section 3. That special taxes are imposed as follows: Manufacturers of oleomargarine shall pay six hundred dollars. Every person who manufactures oleomargarine for sale shall be deemed a manufacturer of oleomargarine.

"And any person that sells, vends, or furnishes oleomargarine for the use and consumption of others, except to his own family table without compensation, who shall add to or mix with such oleomargarine any artificial coloration that causes it to look like butter of any shade of yellow shall also be held to be a manufacturer of oleomargarine within the meaning of said Act, and subject to the provisions thereof.

"Wholesale dealers in oleomargarine shall pay four hundred and eighty dollars. * * *

"Retail dealers in oleomargarine shall pay forty-eight dollars. Every person who sells oleomargarine in less quantities than ten pounds at one time shall be regarded as a retail dealer in oleomargarine. * * *" Comp. St. § 5977.

"Section 5. That every manufacturer of oleomargarine shall file with the collector of internal revenue of the district in which his manufactory is located such notices, inventories, and bonds, shall keep such books and render such returns of materials and products, shall put up such signs and affix such number of his factory, and conduct his business under such surveillance of officers and agents as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may, by regulation, require. But the bond required of such manufacturer shall be with sureties satisfactory to the collector of internal revenue, and in a penal sum of not less than five thousand dollars; and the sum of said bond may be increased from time to time, and additional sureties required at the discretion of the collector, or under instructions of the Commissioner of Internal Revenue."

"Section 8. That upon oleomargarine which shall be manufactured and sold, or removed for consumption or use, there shall be assessed and collected a tax of ten cents per pound, to be paid by the manufacturer thereof; and any fractional part of a pound in a package shall be taxed as a pound: Provided, when oleomargarine is free from artificial coloration that causes it to look like butter of any shade of yellow said tax shall be one-fourth of one cent per pound. The tax levied by this section shall be represented by coupon stamps; and the provisions of existing laws governing the engraving, issue, sale, accountability, effacement, and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to stamps provided for by this section." Comp. St. § 6217.

"Section 16. That oleomargarine may be removed from the place of manufacture for export to a foreign country without payment of tax or affixing stamps thereto, under such regulations and the filing of such bonds and other security as the Commissioner of Internal Revenue, with the approval

of the Secretary of the Treasury, may prescribe. Every person who shall export oleomargarine shall brand upon every tub, firkin, or other package containing such article the word 'Oleomargarine,' in plain Roman letters not less than one-half inch square." Comp. St. § 6228.

"Section 20. That the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may make all needful regulations for the carrying into effect of this act." Comp. St. § 6232.

In 1897 the state of Illinois passed a statute (Laws 1897, p. 3) prohibiting the manufacture of colored oleomargarine in Illinois, and in the course of this trial this statute was, against the objection of the plaintiffs in error, read in evidence. Two of the important sections of this state law read as follows:

"Section 1. Be it enacted by the people of the state of Illinois, represented in the General Assembly, that for the purpose of this act, every article, substitute or compound, other than [that] which is produced from pure milk or cream therefrom, made in the semblance of butter *and designed to be used as a substitute for butter* made from pure milk or its cream, is hereby declared to be imitation butter: Provided, that the use of salt and harmless coloring matter for coloring the product of pure milk or cream shall not be construed to render such product an imitation.

"Section 2. No person shall coat, powder or color with annatto, or any coloring matter whatever, any substance designed as a substitute for butter, whereby such substitute or product so colored or compounded shall be made to resemble butter, the product of the dairy."

The John F. Jelke Company was organized as an Illinois corporation in 1889, the stockholders being George P. Braun, John F. Jelke, and L. V. Fitts; they were also directors and officers. The corporate name of the company at this time was Braun & Fitts Company, and it succeeded to the business and purchased the assets of Braun & Fitts, a partnership. John F. Jelke increased his holdings in the company, and plaintiff in error F. M. Lowry became its secretary in 1902, and continued in that position thereafter, and was so acting at the time of the trial. The change in name of the corporation occurred in 1907.

The George P. Braun Company is an Illinois corporation, and was organized December 5, 1904. In 1908 John F. Jelke became the owner of a large share of stock of this corporation, and shortly thereafter the directors were Ferdinand F. Jelke, F. M. Lowry, John F. Jelke, Jr., William M. Steele, and John F. Jelke. The record shows that both of these companies transacted a very large business, and that their principal place of business was at Chicago, Ill.

Plaintiffs in error were all connected in some way with one of these two companies. John F. Jelke was secretary-treasurer and director of the Braun & Fitts Company, later general manager, and still later president and practically the sole owner of the stock. His relations to the company were the same after it changed its name to the John F. Jelke Company. He also was the owner of over 80 per cent. of the stock of George P. Braun Company and was director thereof; his son being president. Francis M. Lowry was secretary of the Braun & Fitts Company, later known as the John F. Jelke Company, and was secretary and director and stockholder of George P. Braun Company. Prior to his official connection with the Braun & Fitts Company, he was credit man and assistant manager of the company. Plaintiff in error William M. Steele was office and sales manager of John F. Jelke Company from 1908 to the time of the indictment, and was director and stockholder in George P. Braun Company. William P. Jackson, was manager of George P. Braun Company from May 11, 1898, to June 30, 1911. Harry E. Hitchins was salesman for Braun & Fitts Company, later known as the John F. Jelke Company, from May, 1902, to 1910. Hugh D. Cameron, was a former internal revenue officer, and then became salesman for Braun & Fitts Company, and remained in that capacity from 1905 to 1910. William L. Lillard was salesman for the John F. Jelke Company from 1907 to 1909. L. B. Tullis was salesman for Braun & Fitts Company for about nine years. Fred Rapp was salesman for George P. Braun Company from 1907 to 1911.

Abner D. Mize became a salesman for Braun & Fitts in 1900, and left that employment in 1906. O. S. Martin, a former internal revenue agent, became a salesman for the Braun & Fitts Company in 1901, later taking charge of the

New York branch of that company. Both Martin and Mize were discharged by the court on the ground that the statute of limitations had run against the offense so far as they were concerned. Philemon Berry, a former internal revenue collector, was for several years a salesman for the John F. Jelke Company, but he was never apprehended. Harvey P. McFarland was assistant and later chief shipping clerk for Braun & Fitts Company, serving in that capacity from 1900 to the date of the indictment. He was found not guilty by the jury.

To establish its charge of conspiracy, the government attempted to show, and claims the evidence clearly established, a motive on the part of the plaintiffs in error to commit the crime set forth in the indictment. It is claimed that this motive was established by showing: (a) That all of the plaintiffs in error were interested in increasing the sales of oleomargarine produced by the factories of the Jelke companies. All of the plaintiffs in error were either interested as stockholders or were salesmen who received commissions on sales made. (b) The testimony shows that in 1902, when the amended Oleomargarine Act went into force, there was no developed business in uncolored oleomargarine; that the factories engaged in manufacturing this product had previously turned out colored oleomargarine; that the consuming public was not at this time disposed to purchase the uncolored product. (c) That at certain seasons of the year, when the price of butter was at its lowest, it was impossible to manufacture oleomargarine and sell it in competition with butter and at the same time pay a ten cents per pound tax. In other words, colored oleomargarine could not compete in the market with butter in the summer time and pay a ten cent per pound tax.

Having established the motive, the government produced evidence tending to show a systematic and purposeful co-operation among the plaintiffs in error, as well as a common plan and very similar means, to get the colored oleomargarine produced by the Jelke factories upon the market without the payment of the tax of ten cents per pound thereon.

This proof came from the lips of many witnesses, the majority of whom were at one time or another engaged in selling colored oleomargarine to consumers, in violation of the law. It is claimed that the evidence establishes a well-defined plan on the part of the plaintiffs in error to develop the business which was so uniformly followed as to indicate it was preconcerted, and consisted of salesmen of the Jelke Company (one or more of the plaintiffs in error) approaching a retail merchant engaged in handling butter and similar products and proposing to him that he buy uncolored oleomargarine from the factory and engage in what was generally known, and throughout the testimony was described, as "moonshining"—that is, coloring oleomargarine without paying the ten cents per pound tax thereon.

The government further claims that the testimony showed the plaintiffs in error, as well as the John F. Jelke Company and George P. Braun Company, participated actively in carrying out the conspiracy and provided the means by which the object of such conspiracy might be attained. These means, among others, were: (1) The free distribution of coloring matter in bottles and cans to all purchasers of white oleomargarine. (2) The free distribution of tub liners and top and bottom circles with the sale of white oleomargarine. (3) The delivery of white oleomargarine in soft and pliable condition, making it possible for the "moonshiner" to more readily color his purchase. At the same time the colored oleomargarine was delivered in a hard state. (4) The delivery of white oleomargarine in tubs containing two pounds less than the tubs ordinarily carried. This permitted coloring matter to be mixed with the white oleomargarine and the weight would then correspond to the usual weight, thereby more effectually preventing detection. (5) The uncanceled stamps on tubs containing colored oleomargarine were so protected as to permit the "moonshiner" to fill and refill the same tub and prevent detection in case a government inspector appeared. (6) The Jelke companies made false reports to the government as to the names of the actual purchasers of white oleomargarine and the amounts thus purchased. The names of bakeries, not requiring a government license, were given as large purchasers, when in fact no purchases by such bakeries were made. This, it is claimed, was to prevent the government from tracing the output or successfully prose-

cuting the "moonshiner." (7) "Moonshiners," arrested for violation of the law, were provided with bondsmen, legal counsel, and were assisted in other ways. (8) Delivery of oleomargarine in cheese boxes in place of oleomargarine tubs; the delivery of goods in wagons bearing no name; the transfer of goods en route from factory wagons to other wagons; warning sent the "moonshiner" of prospective visits from revenue agents; detailed instructions and advice to men known to be engaged in the "moonshining" business as to the best methods and means of coloring white oleomargarine.

The government contends that these various means were adopted by the plaintiffs in error, and were used by them singly and sometimes jointly, very generally for several years. It is claimed that each and every one of the plaintiffs in error participated, not once, but many times, in accomplishing the end of the alleged conspiracy by the means indicated, and the statements made by the various co-conspirators to the "moonshiners" who testified in the case established the preconcerted common plan, means and purpose as related above.

The government further contends that the evidence showed that the officers of the Jelke companies called the salesmen together regularly (it is claimed on Saturday afternoons) where the plan of extending the business was discussed; that such plan called for a constantly increasing number of customers through the means heretofore set forth, and the salesmen were instructed to advance, if necessary, the difference between the retailer's license fee for selling colored oleomargarine over the license fee charged for selling uncolored oleomargarine.

None of the plaintiffs in error testified upon the trial in their own behalf either to dispute the statements made or to explain those susceptible of two inferences. On behalf of the plaintiffs in error, however, it is contended that each and every one of the so-called means or acts involving one or more of such plaintiffs in error, is explainable on the theory of the innocence of the plaintiffs in error of the crime charged. The government conceded that Braun & Fitts, the John F. Jelke Company, and the George P. Braun Company had at all times paid license fees as manufacturers and the ten cent and one-quarter cent per pound on all oleomargarine manufactured and sold by them, and that all the goods purchased by the "moonshiners" from such companies were tax paid according to law, and had been purchased and paid for at the time the "moonshiners" colored the oleomargarine. Plaintiffs in error showed that the furnishing of free coloring fluid to retailers was not illegal, but was in fact sanctioned by the rulings of the Commissioner of Internal Revenue.

The plaintiffs in error assailed the credibility of the government witnesses and showed that many of them had been retail dealers who had colored oleomargarine and sold it in violation of the law. It appeared from the testimony that many of the government witnesses had been granted immunity, others had pleaded guilty and were awaiting sentence, while still others were serving their time in the penitentiary. Such further statement of the facts as may be pertinent to the questions considered will appear in the opinion.

John Barton Payne and William S. Forrest, both of Chicago, Ill., for plaintiffs in error.

Charles F. Clyne and Henry W. Freeman, both of Chicago, Ill., for defendant in error.

Before KOHLSAAT, MACK, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge (after stating the facts as above). Is the indictment sufficient?

Plaintiffs in error appropriately and timely raised this question, and now claim that the "allegations set forth in the indictment do not constitute a conspiracy to defraud the United States." The indictment is assailed:

(A) Because of the defects in the allegations wherein it is sought to describe the conspiracy, and

(B) Because of the defects in the allegations wherein it is sought to describe acts which are therein alleged to have been done to effect the object of the conspiracy.

[1] Contending that the specific allegations following the general charge of conspiracy in paragraph 5 of the indictment, limit and control the general allegations therein found, it is claimed the indictment is insufficient in so far as it attempts to charge the conspiracy for the following reasons: (a) Because not one of the defendants is alleged to be a manufacturer of oleomargarine as defined by section 3 of the act. (b) Because not one of the individuals named or unnamed therein was capable of defrauding or had the power to defraud the United States out of the tax of ten cents per pound. (c) Because the indictment lacks an allegation showing that the tax mentioned in section 19 of the indictment was the tax to become due upon the oleomargarine thus artificially colored, or, if this be not accepted, it does not appear but what the divers persons and individuals referred to in section 17 did not intend to pay the tax. (d) Because the series of these successive acts do not show the defendants agreed among themselves to cause the individuals to do the things named in the indictment at a certain place or certain places within the territory of the United States. (e) Because the indictment does not allege the period of time through which or the times which the said oleomargarine thus artificially colored was to be sold by the divers individuals. (f) Because of the uncertainty as to the meaning of the verb "to cause," it having been used with different meanings in the same indictment; likewise because of the uncertainty of the verb "to furnish," and because of the uncertainty as to whether the profit accruing from the sale of artificially colored oleomargarine was to be for the profit of the defendants or of the divers individuals, and because of the uncertainty arising out of the omission of the words "the defendants" or the words "said individuals" in section 18 of the indictment, and because from all of the averments it is uncertain what is described in section 5 of the indictment as "certain oleomargarine artificially colored to look like butter of the shade of yellow," or what was referred to in section 17 of the indictment as "said oleomargarine thus artificially colored."

(B) The sufficiency of the indictment is also attacked because: (a) No act therein alleged to be "an act done to effect the object of the conspiracy" is shown to be such an act within the rule laid down in Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614. (b) Because it does not appear that any one of such overt acts was done after the conspiracy was formed. (c) Because the overt acts alleged to have been committed in furtherance of such conspiracy were not sufficiently described or particularized, in that they failed to identify the particular places or buildings in or at which the white oleomargarine and the coloring matter were delivered.

The foregoing statement follows the order and analysis of the learned counsel for plaintiffs in error. In support of these criticisms of the indictment under consideration, we have been favored with a lengthy and elaborate brief, evidencing much learning and great industry, and containing a most complete collection of decisions bearing on the imperfections of indictments and the construction and definition of words and phrases, which in turn has invited a discussion by the court, which, if accepted, would result in an opinion unjustifiable in length and involve the discussion of legal questions that are no longer moot. While perhaps instructive, we are convinced that many of the criticisms made are hypercritical and evidence scholastic ingenuity, but if adopted in this case, or applied to the average indictment, "would rightly bring odium upon the administration of justice in the minds of all sensible people, whether learned in the law or not."

[2] Decisions that reject technical objections to criminal indictments are not now the exception, and an overwhelming array of authorities may be found that call for liberal construction of criminal pleadings. A few are herewith collected. Harper v. United States, 170 Fed. 385, 392, 95 C. C. A. 555; Ex parte Pierce (C. C.) 155 Fed. 663, 665; Peters v. United States, 94 Fed. 127, 131, 36 C. C. A. 105; United States v. Clark (C. C.) 37 Fed. 106, 107, 108; Rosen v. United States, 161 U. S. 29, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; United States v. Ehrgott (C. C.) 182 Fed. 267, 270; Warren v. United States, 183 Fed. 718, 721, 106 C. C. A. 156, 33 L. R. A. (N. S.) 800; Alkon v. United States, 163 Fed. 810, 812, 90 C. C. A. 116; Coffin v. United States, 156 U. S. 432, 449, 15 Sup. Ct. 394, 39 L. Ed. 481; Ulmer v. United States, 219 Fed. 641, 134 C. C. A. 127.

The rule by which the sufficiency of this indictment must be measured is well set forth in Harper v. United States, 170 Fed. 385, 392, 95 C. C. A. 555, 562:

"The rules governing criminal pleadings have become less technical and more practical, but no less protective to the accused, since the Supreme Court in a series of cases beginning in the year 1893, notably Dealy v. United States, 152 U. S. 539 [14 Sup. Ct. 680, 38 L. Ed. 545]; Evans v. United States, 153 U. S. 584 [14 Sup. Ct. 934, 38 L. Ed. 830]; Dunbar v. United States, 156 U. S. 185 [15 Sup. Ct. 325, 39 L. Ed. 390]; Cochran & Sayre v. United States, 157 U. S. 286 [15 Sup. Ct. 628, 39 L. Ed. 704]; and Rosen v. United States, 161 U. S. 29 [16 Sup. Ct. 434, 480, 40 L. Ed. 606]—has under various circumstances declared that allegations in an indictment are sufficient if their meaning is 'clear to the common understanding'; that 'no impracticable standards of particularity should be set up'; that 'few indictments under the national banking law are so skillfully drawn as to be beyond the hypercriticism of astute counsel'; and that 'the entire indictment is to be considered in determining whether the offense is fairly stated.' The liberal tendency of the doctrine so announced has been followed by this court in Clement v. United States, 149 Fed. 305 [79 C. C. A. 243], Rinker v. United States, 151 Fed. 755 [81 C. C. A. 379], Stearns v. United States, 152 Fed. 900 [82 C. C. A. 48], and Morris v. United States, 161 Fed. 672 [88 C. C. A. 532]."

Section 37 of the Criminal Code, formerly section 5440, R. S., and now section 10201, U. S. Comp. St. 1916, reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any

purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

The sufficiency of the allegations appearing in indictments attempting to charge a violation of this section has been challenged in the federal courts in so many cases that it is unnecessary to search elsewhere for precedents. The following leading cases throw much light upon the questions here under consideration, and an examination of them leads to the deduction of several general rules that go far toward solving the objections made by the plaintiffs in error: See United States .v. Moore (C. C.) 173 Fed. 122; Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545; United States v. Keitel, 211 U. S. 370, 29 Sup. Ct. 123, 53 L. Ed. 230; United States v. Rabinowich, 238 U. S. 78, 35 Sup. Ct. 682, 59 L. Ed. 1211; United States v. Hirsch, 100 U. S. 33, 25 L. Ed. 539; Curley v. United States, 130 Fed. 1, 64 C. C. A. 369; United States v. Gooding, 12 Wheat. 460, 6 L. Ed. 693; Rosen v. United States, 161 U. S. 29, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; Pettibone v. United States, 148 U. S. 198, 13 Sup. Ct. 542, 37 L. Ed. 419; Perrin v. United States, 169 Fed. 17, 94 C. C. A. 385; Dunbar v. United States, 156 U. S. 195, 15 Sup. Ct. 325, 39 L. Ed. 390; United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135; United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588; United States v. Munday (C. C.) 186 Fed. 375; United States v. Munday, 222 U. S. 175, 32 Sup. Ct. 53, 56 L. Ed. 149.

The general conclusions deducible from these cases are: (a) The conspiracy statute creates and defines an independent crime, and an offense against the statute is committed when "two or more persons conspire" either (a) "to commit any offense against the United States," or (b) "to defraud the United States in any manner or for any purpose" etc., and (c) an overt act by one of the conspirators follows.

[3] (b) An indictment is generally sufficient which charges a statutory crime substantially in the words of the statute, except in such cases where other precedents have been firmly established in analogous offenses at common law, or where such a charge would not fairly inform the accused of the nature of the charge preferred against him.

[4] (c) An indictment attempting to charge conspiracy is sufficient if it follows the language of the statute and contains a sufficient statement of an overt act to effect the object of the conspiracy, excepting where the object of the conspiracy is in itself lawful, and in such case the means must be set forth with such particularity as to disclose their illegality and the intended criminal intent, and except also those cases where the conspiracy is to defraud the government in a manner that would not permit of the defendants being fairly and reasonably informed of the character of the offense without such detailed statement of the means and the time and place being set forth.

[5] (d) The antecedent crime, if any, which is the end and object of the conspiracy, need not be described with the same particularity in

the conspiracy charge as in an indictment where the crime itself and not the conspiracy to commit it is the offense charged.

A wide difference between opposing counsel over two propositions explains much of the variance in their contentions.

(a) The government contends that paragraphs 6–20 of the indictment set forth the means by which the conspiracy described in paragraph 5 was to be effected, while plaintiffs in error contend these sections contain a more specific and detailed statement of the conspiracy, and therefore control and limit the general charge of conspiracy found in section 5.

(b) Plaintiffs in error attack the sufficiency of the allegations in paragraphs 6–20, even if the court should conclude that they are but a statement of the means which the plaintiffs in error adopted to carry their conspiracy into effect, and base their attack upon the omissions heretofore pointed out. The government, on the other hand, contends that these "means" (paragraphs 6–20), were not necessary allegations, but were inserted to more fully apprise the plaintiffs in error of the character of the charge preferred against them.

Construing the whole indictment, we are of the opinion that such allegations as appear in paragraphs 6–20 set forth the means by which the general conspiracy was to be effected.

We cannot escape the conclusion that the fair intendment of the pleading was to set forth the conspiracy in paragraph 5, the means by which it was to be carried out appearing in paragraphs 6–20. The overt acts in furtherance thereof (21 in number) appear in paragraphs 21–41.

The second question is determined by conclusion (c) heretofore set forth.

While counsel for plaintiffs in error strenuously contend that this rule no longer prevails in the federal courts, we are convinced that the great weight of authority supports it.

In United States v. Dennee, Fed. Cas. No. 14,948, Judge Woods, in overruling an indictment, used this language:

"A somewhat careful consideration of the authorities convinces me that the better reason is with those who deny the necessity of setting out the means by which the conspiracy was to be carried into effect. But it seems clear that the statute upon which this indictment is based was intended to relieve the pleader from any supposed necessity of setting out the means agreed upon to carry out the conspiracy, by requiring him to aver some act done in furtherance of the conspiracy, and making such act a necessary ingredient of the offense. In the case of Com. v. Shedd, 7 Cush. [Mass.] 514, the court said, that 'the great difficulty in giving effect to the allegation of overt acts in an indictment for conspiracy on a motion in arrest of judgment for insufficiency of the indictment, is this, that overt acts are merely alleged by way of aggravation of the offense, and though alleged, they need not be proved, and the alleged conspiracy might be found by the jury without proof of the precise overt acts charged to have been done in pursuance of the conspiracy.' That difficulty does not exist here, for the overt act is a part of the offense, and must be proved, as laid in the indictment. The reason given in the case just quoted from, why the averment of overt acts cannot have effect in the indictment for conspiracy, does not apply. In my opinion, therefore, this indictment which avers the conspiracy, and then sets out the overt act done to carry it into effect, is sufficient, and it is not necessary to aver the means agreed on to effect the conspiracy. The averment of acts done to effect the

object of the conspiracy, and which must be proven to sustain the indictment, is more than the equivalent of an averment of means agreed on to carry it into effect. This objection to the indictment is not well taken."

In United States v. Goldman, Fed. Cas. No. 15,225, this language appears:

"1. With respect to the statements of the charge in an indictment for conspiracy, it may be observed that though it is usual to state the conspiracy, and then show that in pursuance of it certain overt acts were done, it is sufficient to state the conspiracy alone. And it is not necessary to state the means by which the object was to be effected, as the conspiracy may be complete before the means to be used are taken into consideration. * * * "

In Bannon and Mulkey v. United States, 156 U. S. 468, 15 Sup. Ct. 469, 39 L. Ed. 494, the rule is thus announced:

"At common law it was neither necessary to aver nor prove an overt act in furtherance of the conspiracy, and indictments therefor were of such general description that it was customary to require the prosecutor to furnish the defendant with a particular of his charges. Rex v. Gill, 2 B. & Ald. 204; Rex v. Hamilton, 7 Carr. & P. 448; United States v. Walsh, 5 Dillon, 58 [Fed. Cas. No. 16,636]. But this general form of indictment has not met with the approval of the courts in this country, and in most of the states an overt act must be alleged. The statute in question changes the common law only in requiring an overt act to be alleged and proved."

In Perrin v. United States, 169 Fed. 17, 21, 94 C. C. A. 385, 389, the rule is stated in the following language:

"The unlawful combination is sufficiently charged in the indictment in the allegation that the defendants conspired together 'to defraud the United States of the title and possession of large tracts of land' described in the indictment. It is not necessary to aver the means employed to carry the unlawful combination into effect. * * * Having averred the use of such means as would clearly apprise the defendant of the offense of which he is charged, we think the allegations are sufficient."

See 5 Ruling Case Law, p. 1080.

Mr. Justice Cooley, speaking for the Michigan Supreme Court, in the case of People v. Arnold, 46 Mich. 268, 9 N. W. 406, announced the rule in the following language, citing many cases:

"It is conceded that if the act which the conspirators combine to perform is unlawful, it is not necessary to set out in the information the means intended to be employed in accomplishing it. * * * But if the end in view is lawful or indifferent and the conspiracy only becomes criminal by reason of the unlawful means whereby it is to be accomplished, it becomes necessary to show the criminality by setting out the unlawful means."

See, also, United States v. Dustin, 25 Fed. Cas. No. 15,011; United States v. Benson, 70 Fed. 591, 17 C. C. A. 293; United States v. Gordon (D. C.) 22 Fed. 250. For collection of state cases, see People v. Arnold, supra.

We have not overlooked the contention of counsel for plaintiffs in error that this rule is contrary to the holding of the Supreme Court, as announced in United States v. Cruikshank, 92 U. S. 542, 557–559, 23 L. Ed. 588, and Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830; but we are not persuaded that a different rule of pleading in the Federal courts was there announced.

In the Cruikshank Case, the defendants were indicted on numerous counts and charged with conspiring to injure, oppress, and intimidate certain colored citizens with the intention of preventing them from freely exercising and enjoying the rights and privileges granted them by the Constitution and laws of the United States. The indictment failed to assert any specific right which it was claimed the defendants had invaded, and the court held it bad, because unable to say that a crime in fact had been charged.

The case of Evans v. United States, supra, is not out of harmony with the conclusion here reached. Quoting from Wharton's Criminal Law, the court there says:

" 'The means of effecting the criminal intent,' says Mr. Wharton, 'or the circumstances evincive of the design with which the act was done, are considered to be matters of evidence to go to the jury to demonstrate the intent, and not necessary to be incorporated in an indictment.' "

Having disposed of the general objections that underlie the specific criticisms heretofore set forth, we deem it unnecessary to discuss all of the various questions raised at length.

(A, a) It was not necessary to charge in the indictment that the defendants were manufacturers of oleomargarine. Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; United States v. Keitel, 211 U. S. 370, 29 Sup. Ct. 123, 53 L. Ed. 230. Moreover the fair and legitimate inference from the entire indictment is that the plaintiffs in error were manufacturers of oleomargarine within the definition of the Act. See sections 7, 13, 15, 17, 19.

(A, b) The criticism that the indictment was insufficient because the individuals named or unnamed were not capable of defrauding the United States out of the tax, must likewise be rejected. The crime of conspiracy may be fully committed without the name of a single person who was to color the oleomargarine without paying a tax thereon, being agreed upon. United States v. Holte, 236 U. S. 140, 144, 35 Sup. Ct. 271, 59 L. Ed. 504, L. R. A. 1915D, 281; United States v. Rabinowich, 238 U. S. 78, 35 Sup. Ct. 682, 59 L. Ed. 1211; Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278.

(A, c) The criticism under this heading is refuted by an examination of the indictment. In determining the sufficiency of the allegations in an indictment, the court cannot look at one paragraph alone, but each must be read in the light of its associate paragraphs.

(A, d) This criticism is met by the case of Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545, where the court says:

"In other words, if certain facts make out the crime, it is sufficient to charge those facts, and it is obviously unnecessary to state that which is not essential. Can it be doubted that if these defendants entered into a conspiracy to defraud the United States of public lands, subject to homestead entry, at the given office in the named county, the crime of conspiracy was complete even if no particular tract or tracts were selected by the conspirators? It is enough that their purpose and their conspiracy had in view the acquiring of some of those lands, and it is not essential to the crime that in the minds of the conspirators the precise lands had already been identified."

See, also, Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Ledbetter v. United States, 170 U. S. 606, 18 Sup. Ct. 774, 42 L. Ed. 1162.

(A, f) For similar use of the verbs "to cause" and "to furnish," see United States v. Rabinowich, 238 U. S. 88, 35 Sup. Ct. 682, 59 L. Ed. 1211; United States v. Keitel, 211 U. S. 370, 390, 29 Sup. Ct. 123, 53 L. Ed. 230; section 4746, R. S. (Comp. St. § 9079).

We are convinced that the indictment, giving to all of the words their fair meaning in view of the entire context, thoroughly and with reasonable definiteness apprised the plaintiffs in error of the offense with which they were charged, as well as the means by which, and the places and the time where, the object of the conspiracy was to be consummated.

[6] The failure of the indictment to negative the exception found in section 16 of the Oleomargarine Act, does not subject the indictment to demurrer. The correct rule is laid down in United States v. Denver & R. G. R. Co., 163 Fed. 519, 520, 90 C. C. A. 329, 330, as follows:

"The first of these [objections] is that the plaintiff does not negative the matter of the exception created by the proviso to section 6 of the Act of March 2, 1893, as amended by the Act of April 1, 1896, which gives the right of action for the penalty. This objection must fail, because it is opposed to the settled rule that an exception created by a proviso or other distinct or substantive clause, whether in the same section or elsewhere, is defensive, and need not be negatived by one suing under the general clause."

See, also, Ledbetter v. United States, 170 U. S. 606, 18 Sup. Ct. 774, 42 L. Ed. 1162; Schlemmer v. Buffalo, etc., Co., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681; Smith v. United States, 157 Fed. 721, 85 C. C. A. 353; s. c., 208 U. S. 618, 28 Sup. Ct. 569, 52 L. Ed. 647; Joplin Mercantile Co. v. United States, 213 Fed. 926, p. 933, 131 C. C. A. 160, Ann. Cas. 1916C, 470; s. c., 236 U. S. 531, 35 Sup. Ct. 291, 59 L. Ed. 705; United States v. Cook, 17 Wall. 168, 21 L. Ed. 538.

Indictments charging violation of the Oleomargarine Act but which did not negative any of the exceptions found in the act have been sustained. Enders v. United States, 187 Fed. 754, 109 C. C. A. 502; Hardesty v. United States, 168 Fed. 25, 93 C. C. A. 417; May v. United States, 199 Fed. 42, 117 C. C. A. 420.

B. The various criticisms of the indictment appearing under this head will be considered together. Much of the argument in support of these objections is based upon the erroneous contention that paragraphs 6–20 set forth the conspiracy, and not the means by which the conspiracy was to be accomplished. We have been unable to accept the contention of the plaintiffs in error in this respect, and likewise reject the objections now made pertaining to the overt act. In United States v. Rabinowich, supra, the court said:

"There must be an overt act; but this need not be of itself a criminal act; still less need it constitute the very crime that is the object of the conspiracy."

Paragraph 21, the material portion of which is repeated in each of the 21 overt acts, states:

"That in pursuance of the said conspiracy and in order to effect the object of the same, the said defendants," etc.

This language answers the contention that the indictment is bad because it does not appear that the overt acts followed the forming of the conspiracy.

We conclude that the indictment describes acts by one or more of the parties to the conspiracy to effect the object of the conspiracy within the definition of the Conspiracy Act. See Houston v. United States, 217 Fed. 854, 133 C. C. A. 562; Witte v. Shelton, 240 Fed. 265, 273, 153 C. C. A. 191.

[7] Does the evidence support the verdict?

Plaintiffs in error, and each of them, strenuously insist that the court erred in refusing to take the case from the jury: (1) Because the evidence failed to establish the alleged conspiracy. (2) Because there was no proof that any of the plaintiffs in error committed any one of the overt acts charged in paragraphs 21–40.

In conspiracy cases, the proof must, from the very nature of the charge, consist largely of circumstantial evidence. Rarely can the government find documentary proof of any unlawful combination to defraud it or to violate its laws. The test of the sufficiency of the evidence to support a conviction under this section has not infrequently been set forth. See Marrash v. United States, 168 Fed. 226, 229, 93 C. C. A. 511; Alkon v. United States, 163 Fed. 811, 812, 90 C. C. A. 116; Wharton's Criminal Law (10th Ed.) § 1401; 2 Bishop's New Criminal Law, § 227; United States v. Hamilton, Fed. Cas. No. 15,-288; United States v. Lancaster (C. C.) 44 Fed. 896, 10 L. R. A. 333.

In the present case the question whether the proof is sufficient to sustain a conviction is one that has required careful study. Many violations of the oleomargarine law are clearly shown. Participation in these violations by salesmen of the Jelke Company, including the plaintiffs in error, is likewise clearly established, but the proof of the unlawful combination—the conspiracy charged—rests solely upon the deduction and inferences from facts established on the trial.

After examining all of the testimony carefully from the standpoint of each of the plaintiffs in error, we are convinced that there was evidence sufficient to support the conviction. The claims of the government, set forth in the statement of facts, find support in the evidence.

Single isolated instances tending to establish the conspiracy charged are explainable upon the theory of each of the plaintiff's innocence, but all of the evidence leads the mind logically to the conclusion that the plaintiffs in error, prompted by a desire to profit through increased sales of oleomargarine, conspired to accomplish their purpose by a violation of the Oleomargarine Act. The extent of the operations, and the similarity with which the illegal practices were conducted, invites the belief and justifies the conclusion that it was the result of a premeditated plan. Because of the common interest and continued participation in various illegal acts by the same parties, the plaintiffs in

error, the jury was justified in finding there was a premeditated plan, a conspiracy to which all the plaintiffs in error were parties.

Nor should it be conceded that all of the individual acts standing alone were perfectly consistent with the innocence of the plaintiffs in error. Some of these isolated facts are so suggestive of criminality and consistent with the charge of the indictment as to shake, if not to entirely remove, the presumption of innocence upon which the plaintiffs in error throughout the trial so persistently rested. To illustrate: It appears that one of the plaintiffs in error sought out a butter and egg retailer and gave him the name of a baker, that he might use and advised him to purchase white oleomargarine in this baker's name from the John F. Jelke Company. In a single year the Jelke Company sold this "moonshiner" under a fictitious baker's name 183,576 pounds of white oleomargarine.

Bakers were excepted from certain provisions of the law (see section 16), and in order to get the advantage of these exceptions and to prevent the government from detecting the "moonshiner's" business, the various plaintiffs in error advised retailers to make cash purchases of white oleomargarine from the Jelke factory in the name of a nearby baker. In six months the names of 12 bakers appeared on the books of the company as having purchased 34,034 pounds of white oleomargarine. Upon the trial it was proven that 11 of these bakers had not purchased a pound of white oleomargarine during that period, while one had purchased 72 pounds.

Another "moonshiner" was advised to purchase in the name of Heins and to give his street number as 5102 Elizabeth street. The Jelke Company books showed that Mr. Heins purchased on January 7, 1908, 7,500 pounds of white oleomargarine, the street number being 5102 Elizabeth street. Upon the trial it appeared that Heins was a fictitious person and that at 5102 Elizabeth street there was a little cottage occupied by a widow, Mrs. Schmidt.

These were but a few of the many instances of fraud that were practiced upon the government. Nor does the record fail to connect the plaintiffs in error with these transactions. Frequently not one, but two or three of them, on various occasions, participated in the "moonshining" business, and invariably, according to the testimony, the "moonshiner's" entry into the illegal business was brought about through persuasion by one or more of the plaintiffs in error.

This is not a case where an uncorroborated statement of an accomplice stands contradicted by the sworn testimony of the defendant. It is a case where the testimony of many alleged accomplices, corroborated by other evidence, stands undisputed by the statement of any one of the plaintiffs in error. Notwithstanding the jury was required to find the conspiracy from deductions and inferences drawn from undisputed facts, we are convinced that the record justifies the ruling of the court in denying the motion of the plaintiffs in error to direct a verdict in their favor, based on insufficiency of the evidence.

Plaintiffs in error further contend that the proof fails to connect any one of them with the overt acts charged in the indictment. It is claimed that the deliveries of white oleomargarine specified in the in-

dictment were made by the John F. Jelke Company, and not by any of the plaintiffs in error. It appears that some of the plaintiffs in error were officers, directors, and stockholders of the John F. Jelke Company. An examination of the indictment (paragraphs 21–22) shows that the pleader did not restrict the government to proof of actual delivery of white oleomargarine by one of the co-conspirators but included in all the overt acts the statement that one of the co-conspirators *"caused to be delivered * * * a large quantity * * * of white oleomargarine,"* etc. We conclude that the evidence is in strict accord with the allegations of the indictment.

*Motion to Elect.*—At the close of the trial each of the defendants moved the court to compel the government to elect "to proceed to the jury on only one of the several conspiracies joined in the indictment." The court's refusal to grant the motion is assigned as error. This motion is based upon the position of the plaintiffs in error. heretofore considered, that the indictment charged a conspiracy to conspire followed by numerous charges of conspiracy entered into between the plaintiffs in error and each of the "divers individuals" named and unnamed and therein referred to. We are unable to accept this contention. The indictment charged but one conspiracy, and that appeared in paragraph 5. There being but one charge of conspiracy, the court properly denied the motion of plaintiffs in error.

[8] *Instructions.*—An examination of the record in this case well illustrates the impracticability, if not the impossibility, of the trial judge giving each requested instruction correctly stated. The requested instructions in this case were innumerable. If printed in the ordinary brief, they would cover 100 pages. The proposed instructions that were refused, and to which exceptions were taken, and which constituted a very small part of the requested instructions, cover 23 pages.

The trial judge covered the substance of much of these requested instructions, and clearly and succinctly and with reasonable elaboration presented the issues which were involved in this trial.

Only a few of the criticisms will be separately considered, although we have endeavored, in view of the importance of this case, to carefully consider each and every assignment of error and all the contentions in respect thereto. We are not justified in setting forth the entire charge of the court to the jury, because of its length, although it would be but fair to the learned trial judge that this be done.

[9] The most serious criticism presented by plaintiffs in error arose out of the court's use of the following language:

*"It is the position of the defendants that many of these witnesses were fellow wrongdoers with the defendants; that they helped to commit a crime and that, therefore, their testimony should be rejected in this case."*

Plaintiffs' particular attack is directed to the words printed in italics. We agree with counsel for plaintiffs in error that this language was unfortunate, and, standing alone, misstated the defendants' position. It was not the defendants' position that they were wrongdoers, nor did they admit that they were *fellow* wrongdoers with any of the government witnesses.

But this criticism, like many others, must be viewed in the light of the entire charge. The sentence complained of was given when the court was obviously speaking of the testimony of accomplices, and when he was pointing out the dangers of predicating a conviction upon the testimony of men who were themselves wrongdoers. He said:

"I shall also at this time refer to the situation of many of the witnesses. They have been referred to by counsel in arguments both to the court and to you as 'accomplices.'

"It is the position of the defendants that many of these witnesses were fellow wrongdoers with the defendants, that they helped to commit a crime, and that, therefore, their testimony should be rejected in this case.

"It is the law that the uncorroborated testimony of an accomplice is subject to rejection, and when, therefore, in a case it appears to you that the witness in testifying discloses the fact he is an accomplice, you are not at liberty at the outset to reject his testimony, but it simply advances to you to inquire respecting the question of whether his testimony stands alone, whether there is proof in the case which corroborates him in respect to what he testifies to; and if you find there is proof acceptable to you, which is corroborated, then you are not at liberty to reject his testimony solely because he was an accomplice, but you are required then to proceed with an analysis of his testimony as you proceed with the analysis of the testimony of other witnesses respecting whom that infirmity does not exist."

The following further reference to the testimony of an accomplice was made by the court:

"If you find any witness has deliberately sworn falsely as to any material matter in the case, you are at liberty to reject the whole of his testimony, unless you find it is corroborated by other credible evidence."

We cannot believe that any of the defendants were prejudiced by the criticized portions of the charge when read in the light of all the instructions quoted. The impression which the court conveyed to the jury by this language was unfavorable to those witnesses who testified for the government, and who were referred to as "accomplices." The court intended by this language to warn the jury against conviction upon the testimony of accomplices. It was a further elaboration of his charge previously made bearing upon the weakness of testimony given by co-conspirators.

Plaintiffs in error complain because of the court's definition of the words "reasonable doubt," and because of the language used by the court in reference to the burden of proof. They further complain because the court ignored the rule which makes the presumption of innocence, evidence upon which a reasonable doubt may be based. The first paragraph of the charge clearly made the presumption of innocence in favor of each one of the defendants a fact in evidence which the jury was required to consider and weigh on *each* and *every one* of the issues presented. The language used in defining reasonable doubt is supported by many authorities and is in harmony with the language usually used on similar occasions.

The criticism directed to the court's definition of an overt act is answered by the case of Witte v. Shelton, supra.

Criticism is made of the following language used by the court:

"While the fact is for you to find, gentlemen, I express to you the opinion, you need not accept it if you do not care to, and if your judgment leads you to the contrary you may reject it; but I express to you the opinion that, aside from the alleged disclosures made by these defendants, there is corroborative evidence in the case."

, This was not error. Simmons v. United States, 142 U. S. 148, 155, 12 Sup. Ct. 171, 35 L. Ed. 968; Vicksburg & Railroad Co. v. Putnam, 118 U. S. 545, 7 Sup. Ct. 1, 30 L. Ed. 257; United States v. Philadelphia & Reading R. R., 123 U. S. 113, 8 Sup. Ct. 77, 31 L. Ed. 138.

In fact, upon all of the evidence in this case it would not have been error for the court to charge the jury as a matter of law that there was corroborative evidence supporting the alleged declarations of the plaintiffs in error.

The government contends that no proper exception was taken by plaintiffs in error to present the various questions raised by the court's charge to the jury, or its failure to charge as requested, and reliance is placed upon the case of Allis v. United States, 155 U. S. 117, 15 Sup. Ct. 36, 39 L. Ed. 91. We have chosen, however, to examine the charge fully, as well as the requested instructions, to determine whether the trial judge held the scales of justice in even balance, saying all that was necessary to guard the rights of the accused. We find no reversible error.

[10] *Evidence.*—Error is assigned because the court admitted evidence of transactions occurring prior to July 1, 1902, when the Oleomargarine Act went into force.

In this respect the trial judge possessed much discretion as to the period of time during which he would allow the government to produce testimony showing, or tending to show, the motive for the conspiracy, as well as the intent with which the acts were committed. Heike v. United States, 227 U. S. 131, 33 Sup. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128.

The history of this industry, as well as the laws affecting it, were receivable in evidence, in order that the jury might better understand the claims of the respective parties.

But it is contended that numerous specific acts of fraudulent transactions prior to July 1, 1902, were received in evidence for no other purpose than to prejudice the jury against the plaintiffs in error. If the purpose and the sole purport of this testimony was merely to show the defendants were willing to violate the laws of the land, it was, of course, erroneously admitted. On the other hand, this evidence was admissible if the acts described were closely connected with and involved in the object of the conspiracy, and were quite similar to the subsequent acts of the conspirators, of which the government complains.

Prior to July 1, 1902, there was an oleomargarine act in force. Although the tax on colored oleomargarine was increased under the latter act, and the incentive to violate the law through illegal marketing of their product was greater, it was nevertheless the same motive

(differing only in degree) that actuated plaintiffs in error prior to 1902 as it was subsequent to 1902.

The conspiracy was not established by any written documentary proof, but was deducible from the facts and circumstances heretofore related. Many of these acts of themselves were innocent and harmless. Whether these various acts tended to establish the unlawful conspiracy, or were mere innocent acts of the defendants, depended upon the intent and purpose with which they were committed. As throwing light upon this question of intent, the court rightly permitted the government a wide range. Whether innocently committed or performed with criminal intent to accomplish the ends of the conspiracy might well be established by proof of acts of a similar character practiced by the same parties even though they occurred prior to 1902. To illustrate: The government claims that prior to 1902 the defendants caused tubs to be made with an extra hoop, upon which revenue stamps were placed; that the retailer immediately removed the extra hoop without canceling the stamps; that such practice on the part of retailers was approved by, and in fact suggested by, defendants. It was in reference to this testimony, showing the use of this extra hoop prior to 1902, that most of the complaint of the plaintiffs in error under this heading is made.

Obviously, the use of a tub with three hoops is not of itself an act that would invite suspicion or point to guilt on the part of the defendants. But if it appeared that one of the hoops was an extra hoop, used for no other purpose than to carry the revenue stamps, and was in fact placed on the tub for the purpose of assisting the retailer in avoiding the revenue law, its presence was no longer consistent with the theory of innocence. After 1902, similar means (see subdivision 5 of statement of means in statement of facts) were adopted, which of themselves were perfectly innocent. The protection of revenue stamps upon the tubs containing colored oleomargarine may have been practiced with no criminal intent, but if they were placed there so as to permit the "moonshiners" to fill and refill the same tubs, and to prevent detection in case a government inspector appeared, a different deduction followed. The practice of providing the extra removable hoop to carry the revenue stamp, that the retailer might avoid the provisions of the revenue act prior to 1902, is so similar in character to the practice of providing the revenue stamp with a protection that would permit the retailer to violate a similar law (followed after the act of 1902) as to justify the admission in evidence of the former practice in order to throw light upon the intention of the same parties under the later practice.

The rule applicable is well laid down in Wood v. United States, 16 Pet. 358, 10 L. Ed. 987:

"* * * Where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of like charac-

ter and nature, the intent and motive may be demonstrated almost with a conclusive certainty."

See, also, Wharton on Criminal Evidence (10th Ed.) p. 145; Williamson v. United States, 207 U. S. 451, 28 Sup. Ct. 163, 52 L. Ed. 278; Van Gesner v. United States, 153 Fed. 55, 82 C. C. A. 180; Chitwood v. United States, 153 Fed. 553, 82 C. C. A. 505, 11 Ann. Cas. 804; Exchange Bank v. Moses, 149 Fed. 340, 342, 79 C. C. A. 278; Thiede v. Utah, 159 U. S. 510, 16 Sup. Ct. 62, 40 L. Ed. 237; Clune v. United States, 159 U. S. 592, 16 Sup. Ct. 125, 40 L. Ed. 269; Heike v. United States, 227 U. S. 145, 33 Sup. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128.

[11] *Illinois Statute.*—The court, against objection, admitted the Illinois statute prohibiting the sale of colored oleomargarine in Illinois, a portion of which statute is quoted in the statement of facts. The government contends that its purpose in offering this statute was the same as it had when offering evidence of transactions prior to 1902.

It appeared that the amount of colored oleomargarine sold to the "moonshiners" was inconsiderable as compared to the amount of uncolored oleomargarine thus sold. The profit upon a pound was the same to the Jelke companies, whether the oleomargarine was colored or uncolored. Plaintiffs in error asserted that under the federal law they were strictly within their rights in selling either colored or uncolored oleomargarine provided the government tax was paid on each sale. In other words, they claimed that this "means" was perfectly consistent with innocence on their part. The government, on the other hand, contended that the sale of colored oleomargarine under certain circumstances shown in the case, while of itself lawful under the federal law, was nevertheless not made by the plaintiffs in error innocently, but was merely one of the "means" used in connection with many others by which plaintiffs in error assisted "moonshiners" in avoiding prosecution. It was for the purpose of throwing light upon the intent of the plaintiffs in error in causing these sales of colored oleomargarine to be made, and for no other purpose, that the existence of the Illinois statute became relevant.

It is quite apparent that the manufacturers, without any greater profit accruing from the sale of colored oleomargarine than was obtainable from selling a like quantity of uncolored oleomargarine, would not have risked the possibility of arrest and conviction for violation of the state law, unless they hoped to increase their total sales by helping the "moonshiners" develop the illegal business. It was by reason of the concurrence of several acts, heretofore termed "means," that the intent of the plaintiffs in error in selling "moonshiners" colored oleomargarine became important.

This deduction is strengthened when the record is examined to ascertain the actual amount of colored oleomargarine thus sold to the recognized or professional "moonshiners." The sales of colored product were so small (and the profits necessarily so limited) that one questions the sincerity of the assertion that plaintiffs in error were in-

nocent of any intent to provide means by which the "moonshiners" might evade the law. One can hardly escape the conclusion that the plaintiffs in error would never have taken the chance of prosecution by the state authorities in view of the small sales of colored oleomargarine to these recognized "moonshiners," if it were not for the fact that the sale of a single tub of colored oleomargarine made it possible for the plaintiffs in error to sell thousands of pounds of uncolored oleomargarine to the same purchaser.

We conclude that, under the circumstances disclosed in this case, the Illinois statute was relevant on the question of intent of the plaintiffs in error in selling colored oleomargarine to certain "moonshiners." See cases cited under last heading.

Nor can we agree with the statement of counsel for plaintiffs in error that the state law was in direct conflict with the federal law. The positions of the state and federal governments were somewhat analogous to the positions of the United States government and some states on the liquor traffic. The imposition of a federal tax upon retail liquor dealers is not inconsistent with the act of any state or community which prohibits the sale of liquor.

In the present case it appeared that the state of Illinois prohibited the manufacture and sale of colored oleomargarine, but did not prohibit the manufacture and sale of uncolored oleomargarine. The federal law imposed a tax (almost, but not quite, prohibitive) upon colored oleomargarine, while the tax upon uncolored oleomargarine was nominal. It is obvious that the two laws were not repugnant to each other.

That the position of the government was understood by the court and jury is shown by the following statement of the counsel for the government made on trial:

"It is their [defendants'] intention which is the subject of examination, because your honor will charge the jury if all these things were done innocently—in the ordinary and usual course of business of these defendants, they cannot bring in a verdict of guilty. They can base and predicate a verdict of guilty only upon a finding that these various acts [means] were done with a criminal intent."

Again, it is doubtful if the mere reception in evidence of the Illinois statute under any circumstances constituted reversible error. The trial occurred in Illinois. The court and jury were presumed to know the law, and were required to take judicial notice of this statute.

Nor does the record show that all of the Illinois statutes complained of were read to the jury by the government's attorney. At least a portion of the law, not bearing on any portion read by the government's attorney, was read to the jury by the defendant's attorneys.

[12] *Cross-Examination.*—It is claimed the court unduly restricted counsel for plaintiffs in error in their cross-examination of government witnesses. In considering this assignment of error, we must bear in mind that there were many defendants, and many able attorneys representing them. The government witnesses were numerous, and a situation was disclosed by many of them that was not disputed. Their testimony given on direct examination, in some instances at least, was

not such as to call for long cross-examinations. Many of them admitted they had been convicted of criminal offenses or were under indictment. Some admitted that immunity had been offered them. These discrediting facts being admitted, the ends of justice could hardly be furthered by humiliating these witnesses. There is certainly a limit to the extent that a witness may be cross-examined. Nor is it proper for an able counsel to convert a cross-examination into an argument to the jury.

The trial judge is in the best position to determine how far the cross-examination should proceed, and, when convinced that the facts are all presented and fairly before the jury, the examination of a witness, either on direct or cross examination, should cease.

[13] Complaint is also made because it is claimed the court permitted the government to cross-examine its own witnesses. It appears from the record that the court upon its own motion, but not in the presence of the jury, directed the attorneys for the government to take certain witnesses into the adjoining room and read to them the testimony of such witnesses given before the grand jury, and then recall them and renew certain questions that had previously been answered evasively. The following appears in the record:

"The Court: Now, these two witnesses Salvo and Paule—of course, I am not particularly interested in what testimony goes in, what its quality is; but if the government claims that these two witnesses have definitely committed themselves before the grand jury to conversations that they now happen not to recall, in my judgment their attention should be called definitely in some way to those conversations. *They appear to be rather conveniently forgetful.*

"Mr. Wilkerson: We ought to have a chance to straighten out their testimony, because we will have to deal with them on the theory that they testified falsely here, if they do not; that is all.

"The Court: I feel that is why I wanted these witnesses to state—if the government has the record of the grand jury and claim those men did definitely commit themselves to conversations, which, according to the ordinary course of human events a man would not forget so readily. I think the attention of the witnesses should be called to that testimony.
*       *       *       *       *       *       *       *       *       *
"The Court: I don't mean in open court. I mean take a number of these witnesses into the District Attorney's office—I don't care whether it is in your presence or not—and read that to them and then recall them to the stand and ask them whether, since the testimony has been called to their attention, they still adhere to what has been said on the stand.
*       *       *       *       *       *       *       *       *       *
"The Court: I don't like a witness to leave the stand under the condition these witnesses did."

The testimony given by these witnesses before the grand jury was thereafter read to them, and the witnesses were recalled, and conversations which they had previously stated they had forgotten were then related.

Is this error? We think not. When a witness upon the trial of any case, whether criminal or civil, convinces the court that he is "conveniently forgetful," the trial judge is amply justified in taking matters into his own hands, and on his own motion taking such steps as will lead to the ascertainment of the truth.

It is true that trials in criminal cases should be so conducted as to

insure the acquittal of the innocent, but it must not be forgotten that they are also conducted for the purpose of convicting the guilty, and in all cases the court should endeavor to get the real facts—the truth. When the judge is convinced that a witness is conveniently hiding behind the answer, "I can't recall," or "I don't remember," which is tantamount to perjury, he fails in his duty if he does not take such necessary steps as will reawaken the witness' conscience and his memory.

In the present case, in respect to the matter under consideration, the action of the trial court is to be commended rather than criticized.

Many other objections to the ruling of the court in admitting evidence appear in the briefs of plaintiffs in error. They need not be separately considered. Some are, for want of proper objections, not properly before us. Others must be overruled because plaintiffs in error misconstrue the court's ruling. Still others pertain to testimony that had no bearing upon the outcome of the case.

We fail to discover reversible error in the admission of evidence over the timely and proper objections of plaintiffs in error.

The case has been fully and we believe fairly tried. We find no reversible error.

Judgment is affirmed.

MACK, Circuit Judge (dissenting). Proof of earlier similar acts is admissible for the purpose of establishing the motive, design, or intent which accompanied the later and alleged criminal transactions. That such evidence may be prejudicial to a defendant by establishing that he committed other crimes does not make it inadmissible; it compels, however, the exercise of caution on the part of the court in receiving it, and in instructing the jury as to its proper scope, and on counsel in using it in argument.

In this case, such proof would be admissible to show that the later acts, susceptible of an innocent or criminal interpretation, were done with criminal intent; specifically, in furtherance of a conspiracy to defraud the government out of the ten cents per pound tax levied on the sale of colored oleomargarine.

Motive, however, is in no manner involved; if defendants, with criminal intent, did what they are charged with having done, the motive, money making, was apparent from the transactions themselves. That they had a like motive in earlier criminal transactions is immaterial; proof, therefore, of such other dealings, merely to show a readiness to violate the law of the land in order to increase their business and the profits thereof, is inadmissible. Its only tendency is to prejudice the jury.

The Illinois statute forbidding the sale of colored oleomargarine had no bearing whatever on the innocence or guilt of defendants or on their motive, design, or intent in committing the acts charged against them. The evidence is clear that defendants, like all other oleomargarine manufacturers, sold very much more white than colored goods, both before and after the federal act of 1902 had imposed a heavy tax on the sale of colored oleomargarine. Every such

255 F.—19

sale was in violation of the Illinois law; proof of the law and sales thereunder demonstrated only that defendants, for a commercial profit, were ready to risk an Illinois criminal prosecution both before and after 1902.

The only inference to be drawn therefrom bearing on the present charge is that, as defendants were ready to violate Illinois law in order to make money, they were also ready to conspire to commit a federal crime for the same purpose. As well might proof of the law forbidding larcenies and embezzlements and of the violation thereof be admitted; the inference would be equally cogent.

While the federal court takes judicial notice of state statutes, and while, of course, proof of the sale of colored goods after 1902, as part of the present case, is admissible, even though it necessarily shows a violation of Illinois law, the introduction of the statute itself and the proof of its violation prior to 1902 was, in my judgment, without justification. Whatever the purpose of the government's counsel, the necessary effect of this serious error was to prejudice the jury; an effect greatly enhanced by the use of the evidence in the argument and in no wise mitigated by any instruction.

The evidence as to the use before 1902 of extra hoops on tubs to facilitate the destruction of the revenue stamp was, in my judgment, also inadmissible. It tended to show a conspiracy between some of the defendants to defraud the public by enabling tax-paid oleomargarine to be sold as butter and to defraud the government by evading payment of the wholesale oleomargarine dealers' license.

The acts charged against defendants in the carrying out of the present alleged conspiracy are of a different character and have a different purpose. No swindling of the public is involved; the alleged criminal intent is not to defraud generally, or even to defraud the government generally, but specifically to defraud it by evading payment of the new and totally different tax on colored oleomargarine.

The effect of this evidence, too, was necessarily prejudicial to defendants. As counsel said in argument to the jury:

"The dealer could sell this oleomargarine as butter. That was the state of mind of John F. Jelke prior to 1902. He was willing to violate the law, without respect or regard to the laws of the United States. He made these tubs and put them up in such a way that his customers could defraud the people whom they were selling the goods to by selling this oleomargarine to them as butter, and made it possible for these dealers to defraud this government out of the whole license, by fixing the tubs up so that they could sell as butter, thereby deceiving the revenue officers.

"Ah, gentlemen, that situation shows the state of mind of John F. Jelke away back prior to 1902, and if at that time John F. Jelke would violate the law, John F. Jelke would assist these various dealers and customers of his in violating the law for the purpose of making a market for his oleomargarine, there is no reason to think that John F. Jelke would not violate the law in 1902, 1903, and 1906. * * *

"That transaction back in 1900, gentlemen of the jury, is for the purpose of showing the motive and state of mind towards the United States, and the enforcement of the law, of the defendant John F. Jelke."

While in my judgment the court erred in unduly limiting the cross-examination, it is unnecessary to enlarge upon this point, especially as, in itself, it might not constitute reversible error.

While agreeing, as I do, with much of the majority opinion, especially as to the validity of the indictment, I am impelled to the conclusion that, for the errors specified, the judgment should be reversed, and a new trial granted.