**MADDELIN et al. v. UNITED STATES.**

No. 4466.

Circuit Court of Appeals, Seventh Circuit.

Jan. 9, 1931.

---

Harold J. Bandy, of East St. Louis, Ill., for appellants.

Harold G. Baker, U. S. Atty., and Ralph F. Lesemann, both of East St. Louis, Ill., for the United States.

Before ALSCHULER, SPARKS, and PAGE, Circuit Judges.

SPARKS, Circuit Judge.

Appellants were jointly prosecuted and convicted with Margaret Maddelin and Sam Mumper on three counts of an indictment charging them with conspiracy to violate the provisions of the National Prohibition Act, with the illegal transportation of intoxicating liquor, and with the illegal possession of the same. Dan Dominic Maddelin, referred to hereafter as Dan, was sentenced to serve a prison term of a year and a day on each of the first and second counts, which terms were to be served concurrently; and he was fined $500 on the third count. Joe Maddelin, referred to hereafter as Joe, was sentenced to serve a jail term of six months on each of the first and second counts, the terms to be served concurrently; and he was fined $300 on the third count. The sole question presented by each appellant is whether there was sufficient evidence presented to warrant the trial court in submitting the cause to the jury on either count. Talmadge v. United States (C. C. A.) 4 F.(2d) 378.

In determining, on appeal, whether the evidence is sufficient to authorize a submission to the jury, the court will take the view of the evidence, and the inferences reasonably and justifiably to be drawn therefrom, which is most favorable to the government. France v. United States, 164 U. S. 676, 17 S. Ct. 219, 41 L. Ed. 595; Reid v. United States (C. C. A.) 44 F.(2d) 51.

It is seldom that a charge of conspiracy can be proved by direct evidence, and such a charge is usually established by proof of facts and circumstances from which the existence of a conspiracy is inferred. If such inferences are natural and reasonable they will sustain the conviction. Jelke v. United States (C. C. A.) 255 F. 264; Anstess v. United States (C. C. A.) 22 F.(2d) 594; Zeiger v. United States (C. C. A.) 32 F.(2d) 241.

From the record we gather the following facts: Appellants are brothers, and during April, May, and June, 1930, resided on adjoining lots a short distance southwest of Collinsville, Ill. Both houses and lots had been owned by Dan, but previous to April, 1930, Dan had sold the north house and lot to Joe. At a distance of about two city blocks south of these houses a public highway runs east and west. From this highway an unimproved road runs north to the north line of Joe's lot and ends there. Appellants' houses are on the east side of this unimproved road and face west. A private driveway extends from the unimproved road between and to the rear of the houses. Immediately west of the north and south road, and parallel to it, is a hedge fence, and west of the hedge is a woods. No houses except appellants' are located on either side of the north and south road.

On April 1, 1930, a government agent went to Dan's home, and saw him standing in his back yard near an old empty concrete vat which was fifteen feet deep and about ten or twelve feet long. It had been recently repaired, and Dan told the agent that it had formerly been used in connection with a still, but that he was repairing it for use as a cistern. Dan had a key to Joe's house, but said Joe did not live there. With Dan's permission the agent went into the basement of Joe's house, and found there a new upright

steam boiler, similar to those used with stills, and twelve or fifteen new gas pipes of different lengths, all knuckled up. There was a vat four or five feet deep, ten feet long, and five or six feet wide, and forty sacks marked "corn sugar."

On June 10, government agents visited the place and found a freshly cut gap in the hedge west of the road. It was about eight feet wide and almost directly opposite Joe's house. On the night of June 12 government agents again visited the place. Shortly after their arrival an automobile came from the south and turned eastwardly into the driveway between the houses, and stopped. The automobile lights were then turned out, and the occupant went into one of the houses, but which one the agents did not see.

In about a minute or so afterward a Ford coupé came from the south and turned up to the gap in the hedge on the west side of the road, and stopped. The occupant turned his automobile lights out, and with a flash-light in his hand went into the rear door of Dan's house. Shortly thereafter he, accompanied by a woman, came out of the rear door of Dan's house and with a lighted flash-light entered the gap in the hedge, where they turned immediately to their right and proceeded about thirty feet to the north on the west side of the hedge. The agents heard either the man or the woman say, "Here it is," and then heard the rattle of cans. They saw the man and woman rise up with what appeared to be an alcohol can in a gunny sack in each of their hands, which they brought to the Ford coupé and placed in its rear compartment. The woman returned to Dan's house and entered the rear door. The man entered the Ford coupé and drove south to the main road. The government agents followed and arrested him, and found in the rear of his coupé six five-gallon cans of alcohol. The man's name was Sam Mumper, one of the defendants in this cause. Later in the evening the agents searched the place where Mumper and the woman got the alcohol, and they found seven more five-gallon cans of alcohol, each in a corn sugar sack. They also found three one-gallon cans of alcohol close to the gap in the hedge. It was the same kind of alcohol as that placed in the Ford coupé by Mumper and the woman, and all the cans were exactly alike. Each can had a large "C" impressed on the top. Dan's wife said that she had been at home all evening, and that she was the only woman in Dan's house that night. She further said that the automobile which was parked between the houses

in the early part of the evening belonged to her. This Dan denied, saying it belonged to a friend of his.

About 11:30 o'clock that night Dan arrived at his home in his automobile, accompanied by Joe. The agents arrested both of them. Dan's coat was lying on the front seat, and in one pocket was found a receipt from the agent of the Continental Can Company, dated June 11, 1930, for $62, in payment for two hundred cans. In response to a suggestion by one of the agents that he believed Dan could tell a whole lot about this, Dan said: "I could but I won't now. After the case is over with I will tell you plenty."

■ The only evidence which in any way tends to establish the guilt of Joe is the fact that the vat, boiler, pipes, and sugar sacks were found in the basement of the house which he owned. He was not living there at that time. Dan had the key, and there is no evidence whatever that Joe had any knowledge that these things were in his basement. These facts were not sufficient upon which to submit to the jury the charges against him, and his motion for a directed verdict should have been sustained.

■ On the charge of conspiracy against Dan, we think the evidence was sufficient to warrant a submission to the jury. He had a key to Joe's house, in which Joe did not live. From this fact Dan apparently had possession and control of the house at that time. With the exception of a still, the things necessary for the manufacture of illicit liquor were located in the cellar, and Dan knew it. Eighty gallons of liquor in five-gallon cans were found hidden along the hedge, just across from his house, on a short unimproved road which apparently was not used by any one except the occupants of these two houses and those who might call there. Dan's wife knew that this liquor was hidden along the hedge, and she delivered it after dark to those who came for it; and it is quite significant that Dan purchased and paid for two hundred cans the day before the raid was made. These facts are unexplained, and they are sufficient to warrant the court in submitting them to the jury, from which to determine whether or not the alleged conspiracy existed. On these facts the jury found Dan guilty of conspiracy, and we cannot disturb the finding.

■ We are further of the opinion that these same facts were sufficient to justify the court in submitting to the jury the charge of Dan's possession as set forth in the third count, and the jury's determination is final.

The same evidence was relied upon by the government to sustain each of the three counts. Whether as to Dan it was sufficient to warrant the court in submitting the charge of transporting, as set forth in the second count, is at least questionable, but under all the circumstances we are convinced that the evidence was sufficient to authorize a submission. But even if it were not sufficient, this fact can avail Dan nothing. Inasmuch as the sentences imposed upon him under counts 1 and 2 were for the same period of time, the combined sentence on both counts does not exceed that which could have been imposed for each offense charged in such counts; and, also, they are to be served concurrently, and in such case the cause cannot be reversed as to Dan. United States v. Trenton Potteries Co., 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700, 50 A. L. R. 989.

The judgment is reversed, and the cause is remanded as to Joe, and as to Dan the judgment is affirmed.